# United States District Court

### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| ENERGIUM HEALTH<br><br>v.<br><br>ALI M. GABALI, SHAFIQUL ALAM,<br>DIAGNOSTIC HEMATOLOGY,<br>DIAGNOSTIC HEMATOLOGY-<br>ONCOLOGLY, DIAGNOSTIC<br>HEMATOLOGY, P.C., DIAGNOSTIC<br>HEMATOLOGY – P.L.L.C., ENCORE<br>DIAGNOSTIC LABORATORY, GREAT<br>LAKES EQUIPMENT, L.L.C., S ALAM<br>LAB SERVICE, HEMATOLOGY<br>ONCOLOGY GLOBAL SERVICES,<br>J&K SUPPLIES AND MANAGEMENT,<br>and CONSORTIUM LABORATORY | § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 3:21-CV-2951-S |

## MEMORANDUM OPINION AND ORDER

This Memorandum Opinion and Order addresses Defendants' Motion to Dismiss for Lack of Personal Jurisdiction or to Transfer Venue and Brief in Support [ECF No. 21] ("Motion") pursuant to Federal Rule of Civil Procedure 12(b)(2) and 28 U.S.C. § 1404(a), respectively. The Court has reviewed the Motion, Plaintiff's Response to Defendants' Motion to Dismiss or Alternatively, to Transfer Venue, with Brief in Support ("Response") [ECF No. 27], and Defendants' Reply in Support of Their Motion to Dismiss ("Reply") [ECF No. 32]. For the following reasons, the Court **DENIES** the Motion.

## I.    BACKGROUND

Plaintiff Energium Health filed this action against Defendants Ali M. Gabali ("Gabali"), Shafiqul Alam ("Alam"), Diagnostic Hematology, P.C. ("DH"),[1] Encore Diagnostic Laboratory ("Encore"), Great Lakes Equipment, L.L.C. ("Great Lakes"), S Alam Lab Service, Hematology Oncology Global Services ("HOGS"), J&K Supplies and Management ("J&K"), and Consortium Laboratory alleging civil violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), civil conspiracy, fraud, and theft. First Am. Compl. [ECF No. 9] 1. Plaintiff is a Texas limited liability company with its principal place of business in Dallas, Texas. *Id.* at 2. Defendants Gabali and Alam (collectively, the "Individual Defendants") are individuals domiciled in Michigan. The remaining Defendants (collectively, the "Business Entity Defendants") are Michigan business entities allegedly associated with the Individual Defendants,[2] and their principal place of business is in Michigan. Mot. 12.

Plaintiff's claims center around Defendants' alleged abuse of a "business relationship" that grew between Plaintiff and Defendants for over a year. Mot. 8. At the heart of this business relationship rested the Commission Agreement ("Commission Agreement"), a form of supply contract wherein Plaintiff agreed to supply HOGS, owned and operated by Gabali, with COVID-19 testing supplies. Commission Agreement [ECF No. 28-1] 2. Gabali agreed to procure customers and sell them Plaintiff's COVID-19 test kits in exchange for a fixed commission amount per test sold. *Id.* Plaintiff, HOGS, and Gabali signed the Commission Agreement on August 25, 2020. Resp. 3.

---

[1] Defendants contend that Diagnostic Hematology and Diagnostic Hematology-Oncology are assumed names for Diagnostic Hematology, P.C. and that Diagnostic Hematology-PLLC was terminated before the relevant time period. Mot. 8 n.2 & n.6. For purposes of this opinion, the Court will collectively refer to all four entities as "DH."

[2] The Parties agree that Gabali owns Defendants DH, Great Lakes, HOGS, and J&K, and that Alam owns Encore and partnered with Gabali to form Great Lakes. Mot. 7 n.1, 8 n.2-4; *id.* at 7, 9 n.5.

A few months later, on January 20, 2021, Plaintiff entered into the Billing Contract, another agreement related to the aforementioned business relationship. Billing Contract [ECF No. 28-1] 5-8. Signed by Plaintiff, Gabali on behalf of DH, and a third-party Texas attorney, the Billing Contract "grants authority from the parties . . . to receive monies from the Defendants and disburse monies as payments to [Plaintiff] for products provided." Resp. 3.

Both the Commission Agreement and the Billing Contract (collectively, the "Agreements") contain choice-of-law and forum selection clauses. *Id.* The relevant provision in the Commission Agreement (the "Commission Agreement Forum Selection Clause") reads:

> 8. Governing Law. This Agreement was created and shall be interpreted based on the laws of the State of Texas. Any claims or disputes brought hereunder shall be subject to the jurisdiction of Dallas County, Texas.

*Id.*

The clause at issue in the Billing Contract (the "Billing Contract Forum Selection Clause") reads:

> 1. Choice of Law. The parties agree that this contract was drafted using Texas law and any dispute arising under this Agreement shall be settled with the application of Texas law and the venue for any disputes shall be in Texas.

*Id.*

According to Plaintiff, after signing the Commission Agreement, Gabali began to advise Plaintiff that he was in the process of procuring "major testing contracts" with companies such as "Delta Airlines, United Airlines, and Meijer Supermarkets." First Am. Compl. 12, ¶ 46. Plaintiff claims that Defendants directed communications about the business relationship to Plaintiff via "phone calls, text messages through WhatsApp, and emails." *Id.* at 14, ¶ 54. Gabali allegedly induced Plaintiff to further invest in inventory by demanding that such expenditures were necessary to secure contracts and fulfill the high volume of COVID-19 test orders he would be receiving. *Id.* Plaintiff claims that it complied with Gabali's "demands" because of its

"obligations created by the [Commission Agreement]," namely to supply Gabali with enough COVID-19 test kits to satisfy consumer demand and maximize potential profits. *Id.* at 28, ¶ 133.

Plaintiff alleges that, all the while, Gabali and his business partner, Alam, were using the Business Entity Defendants to shield them from their obligations under the Agreements while continuing to reap their corresponding benefits. *Id.* at 28, ¶¶ 132-34. For instance, Gabali and Alam would use Great Lakes to order COVID-19 test supplies from Plaintiff, but deliver the tests to Encore. *Id.* at 10, ¶ 37. Then, Alam would make partial payments for the supplies using S Alam Service's[3] credit card. *Id.* By the time Plaintiff inquired about the discrepancy, the inventory was gone, and the revenue generated from Gabali's sales was out of Plaintiff's reach, safely "divert[ed]. . . to other [Business Entity Defendants]." *Id.* at 17, ¶ 68.

Plaintiff claims that it relied on Gabali's representations about the major testing contracts and complied with his request that Plaintiff "build an inventory of products worth two million dollars" for DH. *Id.* at 7, ¶ 22. Plaintiff alleges that Gabali made these representations "while knowing that he was planning to dissolve [DH] and divert business to other entities." *Id.* at 11, ¶ 44.

Plaintiff further avers that, over time, Gabali's demands increased in intensity, "creat[ing] a sense of urgency" with "promises of more potential business." *Id.* at 7, ¶¶ 22-23. These alleged communications ultimately induced Plaintiff to invest in the establishment of Consortium Laboratory,[4] a COVID-19 testing laboratory owned and operated by Gabali, as well as a call center, a warehouse, and associated equipment to support the operations. *Id.* at 6-7, ¶ 21. Gabali

---

[3] While Defendants claim that S Alam Lab Services "does not exist," Plaintiff maintains that Defendants used the name "in the course of their scheme." Mot. 17, ¶ 10; Resp. 4.

[4] Defendants claim that "Consortium [Laboratory] had no business dealing whatsoever with Energium" and that it is currently owned by a nonparty to this suit. Mot. 2, ¶ 6; *Id.* at 10, n.6. Plaintiff alleges that Gabali owned Consortium Laboratory during the relevant time and only transferred his ownership interest in 2021 and 2022, which Defendants do not rebut. Resp. 4.

allegedly represented that his foray into the business of processing COVID-19 tests, and Plaintiff's corresponding expenditures, were necessary to attract and satisfy high-volume customers. *Id.* at 7, ¶ 22. But, according to Plaintiff, Gabali "did not . . . use [Plaintiff's] funding as represented," transferring Plaintiff's investments to other Business Entity Defendants "for his personal use and gain." *Id.* at 29, ¶ 137. For example, Plaintiff alleges that the Individual Defendants misappropriated supplies and equipment purchased by Plaintiff for Consortium Laboratory, transferring the property to Encore and refusing to pay Plaintiff back or share any associated revenue with Plaintiff. *Id.* at 17, ¶¶ 70-72. Additionally, Plaintiff contends that it sent commission advances to HOGS and J&K in reliance on Gabali's representations of his "sales revenue plan" and "sales order value with a minimum estimate of approximately $18 million for business year 2021 and $20 million for business year 2022." *Id.* at 7, ¶ 22. Despite Gabali's "promises," Plaintiff maintains that the sales orders were never delivered to customers and that Defendants wrongfully kept the commission advances. *Id.* at 20-21, ¶ 87; *id.* at 12, ¶ 48.

As Plaintiff "discovered the direct business interlocking relation between [Defendants]," the Parties' "business relationship" began to "sour." *Id.* at 10, ¶ 37; Mot. 9. Plaintiff contends that both Individual Defendants had misrepresented their roles within the Business Entity Defendants "to evade the acknowledgment of the outstanding debts and balances owed to [Plaintiff]." First Am. Compl. 14, ¶ 54. When Plaintiff confronted Defendants, the alleged evasions escalated. According to Plaintiff, Gabali began sending "fraudulent invoices" to Plaintiff on behalf of DH purporting to charge Plaintiff for "consultations" and other "fictitious" services. *Id.* at 15, ¶ 60. Per Plaintiff, Defendants fabricated and sent these allegedly false invoices to offset against the debts owed to Plaintiff by Defendants. *Id.* at 13, ¶ 51. Plaintiff notes

that "the sum of [sic] Gabali's fictitious invoices equals the total amount of [Plaintiff's] financial claim on balances owed to [Plaintiff], that is, approximately $2,525,817.60." *Id.* at 15, ¶ 60.

The Parties' relationship ultimately fell apart when Alam, on behalf of Encore, allegedly accused Plaintiff of shipping expired COVID-19 test kits and refused to pay Plaintiff for them. *Id.* at 14, ¶¶ 53-54. Defendants contend that although the COVID-19 test kits at issue arrived with unexpired dates stamped on the outer boxes, they contained test tubes with expired dates and moldy nasal swabs. Mot. 9. Plaintiff claims that Gabali "tampered with" the expiration dates "in [an] attempt to not have to pay for the products[.]" First Am. Compl. 19, ¶ 79.

Plaintiff filed its lawsuit in this Court on November 21, 2022. Over three months later, Great Lakes filed a separate action against Plaintiff in Michigan state court. Mot. 15 n.7. According to Plaintiff, the Michigan state court lawsuit is "limited to claims that allegedly arose in October 2021, which was at the tail end of the time period at issue in this suit[,]" and Great Lakes "has not served process in that action." Resp. 21.

## II.    PERSONAL JURISDICTION

Defendants argue that their minimum contacts with Texas are insufficient to establish personal jurisdiction over them for Plaintiff's claims. Plaintiff responds that the Forum Selection Clauses in the Agreements, RICO's nationwide service of process mechanism, and Defendants' alleged purposeful contacts with Texas each provide an independent basis for this Court to exercise personal jurisdiction over Defendants.

Federal Rule of Civil Procedure 12(b)(2) allows defendants to move to dismiss claims for lack of personal jurisdiction. The plaintiff bears the burden of making a prima facie showing that a court has personal jurisdiction over a defendant. *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 431 (5th Cir. 2014). In considering a motion to dismiss pursuant to Rule 12(b)(2), the court

must accept the plaintiff's "uncontroverted allegations, and resolve in its favor all conflicts." *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000).

Because Texas's long-arm statute extends to the limits of federal due process, this Court has personal jurisdiction over a nonresident defendant so long as the assertion of jurisdiction comports with the Due Process Clause of the United States Constitution. *See Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018). Personal jurisdiction can be general or specific. *See Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001). Parties may also consent to personal jurisdiction through a forum selection agreement. *See Kevlin Servs., Inc. v. Lexington State Bank*, 46 F.3d 13, 15 (5th Cir. 1995). Plaintiff does not contend that Defendants are subject to general jurisdiction in this Court, so this opinion will not address general jurisdiction arguments.

## A. *Forum Selection Clauses*

Federal law governs the enforceability of forum selection and choice-of-law clauses "whether jurisdiction be based on diversity, a federal question, or some combination of the two." *Haynsworth v. The Corp.*, 121 F.3d 956, 962 (5th Cir. 1997). "A forum selection provision in a written contract is prima facie valid and enforceable unless the opposing party shows that enforcement would be unreasonable." *Kevlin*, 46 F.3d at 15 (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)). Where "the language of the provision unambiguously states an effective designation of an exclusive forum[,]" all signatories waive "any objection to venue and personal jurisdiction[,]" absent proof of "fraud or overreaching." *Id.*

### i. *Signatory Defendants*

Defendants do not challenge the enforceability or validity of the Commission Agreement Forum Selection Clause or the Billing Contract Forum Selection Clause (collectively, the

"Forum Selection Clauses"). Rather, they assert that the Agreements do not confer personal jurisdiction over any of them, even Defendants HOGS, Gabali, and DH, (collectively, the "Signatory Defendants"), because Plaintiff's claims are based in tort, thus falling outside the scope of the forum selection and choice-of-law provisions. *See* Reply 4.

The Fifth Circuit has not expressly determined whether federal law or state law governs the interpretation of a forum selection clause's scope where, as here, the district court has federal question jurisdiction over one claim and supplemental jurisdiction over the remaining state law claims.[5] Nonetheless, a choice-of-law analysis is unnecessary given that "federal and state law dovetail to provide the same outcome." *Graves v. BP Am., Inc.*, 568 F.3d 221, 223 (5th Cir. 2009).

Both the Fifth Circuit and the Supreme Court of Texas have expressly declined to draw a general distinction between contract and tort claims in the application of forum selection clauses. *See Marinechance Shipping, Ltd. v. Sebastian*, 143 F.3d 216, 221-22 (5th Cir. 1998) (holding that forum selection clause covering "any and all disputes or controversies arising out of or by virtue of" employment contract included personal injury tort causes of action "arising during the course of employment between [employees and the defendant-employer]"); *see also Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 433 (Tex. 2017) (holding that common-law tort claims fell within the scope of a forum selection clause applying to "dispute[s] arising out of" the agreement because "whether a forum-selection clause applies depends on the factual allegations undergirding the party's claims rather than the legal causes of action asserted"). In *International Software Systems, Inc. v. Amplicon, Inc.*, the Fifth Circuit rejected a nearly identical argument

---

[5] The Fifth Circuit has previously declined to decide whether federal law governs the "validity" of a forum selection clause in a diversity case. *See Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 301 (5th Cir. 2016). However, it has held that in a diversity case, "[w]hen the 'interpretation' of a forum-selection clause is at issue[,]" district courts must "apply the forum state's choice-of-law rules to determine what substantive law governs." *Id.*

where, as here, no breach of contract claim was brought. 77 F.3d 112, 115-16 (5th Cir. 1996). The forum selection clause at issue in that case, governing "all litigation arising out of this lease or any breach thereof," encompassed a fraudulent inducement claim because "the entire controversy centers around which party's interpretation of the contract is the correct one, and whether [the nonmovant] was fraudulently induced to enter into the contract." *Id.*

      1.  Commission Agreement Forum Selection Clause

Other courts have examined the scope of contract provisions that, like the Commission Agreement Forum Selection Clause, signed by Gabali and HOGS, apply to the relevant agreement and any disputes brought or arising "hereunder." Resp. 3. In *William Noble Rare Jewels ex rel. William Noble, Inc. v. Christie's Inc.*, the court held that a contract's forum selection clause covering "any dispute hereunder" encompassed the plaintiff's breach of fiduciary duty claim because it "challeng[ed] an act or omission that [the defendant] took or failed to take in the course of invoking a right or executing an obligation specified in the contract." 231 F.R.D. 488, 492 (N.D. Tex. 2005). In *Lowder v. RF Logics, Inc.*, the court found that plaintiff's claims for breach of fiduciary duty, conversion, violation of the Texas Theft Liability Act, fraud, fraudulent inducement, and tortious interference fell within the scope of a "hereunder" forum selection clause because they "[arose] as a result of the contract." No. SA-11-CV-544-FB, 2011 WL 13324142, at *12 (W.D. Tex. Dec. 7, 2011); *see also AlliantGroup, L.P. v. Mols*, No. CV H-16-3114, 2017 WL 432810, at *7 (S.D. Tex. Jan. 30, 2017) (enforcing an "arising hereunder" forum selection clause against the plaintiff's tort claims because they "ultimately depend[ed] on the existence of a contractual relationship between the parties," and concerned "the same operative facts" as the related contract dispute).

In the present case, Plaintiff's claims for violations of civil RICO, civil conspiracy, fraud, and theft "[arose] as a result of the [Commission Agreement]" because they "ultimately depend on the existence of a contractual relationship between the parties," and both the tort claims and circumstances surrounding the formation and performance of the Commission Agreement involve "the same operative facts." *Lowder*, 2011 WL 13324142, at *12; *AlliantGroup*, 2017 WL 432810, at *7. Plaintiff alleges that executing the Commission Agreement was one of the first steps Defendants took in furtherance of their racketeering enterprise and conspiracy to commit theft and fraud. First Am. Compl. 6, ¶ 21. According to the First Amended Complaint, after securing a fixed price and commission for Plaintiff's COVID-19 testing supplies in the Commission Agreement, Gabali then fraudulently induced Plaintiff to invest in inventory needed to fulfill the high volume of COVID-19 test orders he would purportedly be receiving from major companies. *Id* at 12, ¶ 46.

Plaintiff's complaint further avers that Gabali induced Plaintiff to invest in the establishment of Consortium Laboratories, a call center, a warehouse, and associated equipment. *Id.* at 7, ¶¶ 22-23. Defendants allegedly engaged in theft when they took the COVID-19 test kits sent by Plaintiff but refused to pay for or return them to Plaintiff based on false representations that the test kits were expired. *Id.* at 14, ¶ 53-54. Moreover, Plaintiff alleges that Defendants took possession of the equipment Plaintiff purchased to maximize both Parties' profits under the Commission Agreement, transferred the equipment to other Business Entity Defendants to conceal it, and refused to return or pay for it. *Id.* at 24, ¶ 105. In addition, Plaintiff contends that Defendants stole advance commission payments provided by Plaintiff pursuant to the Commission Agreement through misrepresentations about their sales, then kept the payments

without ever sharing the sales revenue amount with Plaintiff as required by the Commission Agreement. *Id.* at 7, ¶ 22.

Accordingly, Plaintiff has established personal jurisdiction over Defendants Gabali and HOGS because all of the alleged torts occurred "in the course of invoking a right or executing an obligation specified in [the Commission Agreement]." *William Noble*, 231 F.R.D. at 492.

### 2.   Billing Contract Forum Selection Clause

The Billing Contract Forum Selection Clause, signed by Gabali on behalf of DH, is even broader than the Commission Agreement Forum Selection Clause. Resp. 3 ("[T]he venue for *any disputes* shall be in Texas.") (emphasis added). In evaluating similar forum selection clauses, courts have found them applicable to tort claims resulting from the contract at issue. *See Sterling Forest Assocs., Ltd. v. Barnett-Range Corp.*, 840 F.2d 249, 250 (4th Cir. 1988) (enforcing forum selection clause against negligence claims where provision read, "in any dispute jurisdiction and venue shall be in California"), *abrogated on other grounds by Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495 (1989); *see also Wong v. PartyGaming Ltd.*, 589 F.3d 821, 825 (6th Cir. 2009) (upholding enforcement of clause reading, "the agreement shall be governed by the laws of Gibraltar and any disputes shall be subject to the exclusive jurisdiction of the courts of Gibraltar" against misrepresentation claim).

In *Micropower Group v. Ametek, Inc.*, the district court rejected the plaintiff's argument that its fraud, interference with business relations, intentional misrepresentation, and misappropriation of trade secrets claims fell outside the scope of a clause reading:

> Irrespective of the place of performance, this Order shall be construed and interpreted according to the Laws of the Commonwealth of Pennsylvania. The exclusive forum for adjudication of any disputes shall be the federal or state courts of the Commonwealth of Pennsylvania.

953 F. Supp. 2d 801, 807 (S.D. Ohio 2013). While the district court recognized that "some of their claims are torts that could have been committed independent of a contractual relationship[,]" it did not follow that those claims "[were] not governed by a contract when one exist[ed]." *Id.* at 808-09 (citing *Digital Envoy, Inc. v. Google, Inc.*, 319 F.Supp.2d 1377, 1380 (N.D. Ga. 2004)). *But see Thompson v. Handa-Lopez, Inc.*, 998 F. Supp. 738 (W.D. Tex. 1998).[6] Rather, the plaintiff's claims all related to the defendant's alleged scheme to use the parties' contractual, business relationship to mislead the plaintiff and misappropriate its proprietary information. 953 F. Supp. 2d at 805. Thus, the plaintiff's claims "hinge[d]" on the terms of the parties' contractual relationship and the defendants' alleged abuse thereof. *Id.* at 808.

Like the forum selection clause in *Micropower*, the Billing Contract Forum Selection Clause contains no language limiting "any disputes," to those "brought" under the Billing Contract. *Id.* at 807. Accordingly, just as in *Micropower*, Plaintiff's claims fall within the scope of the Billing Contract Forum Selection Clause because they "hinge" on the Parties' contractual, business relationship and the alleged abuse thereof. *Id.* at 808. The Billing Contract employed a Texas attorney to serve as a third-party custodian of Defendant DH's "payments to [Plaintiff] for products provided" as their "business relationship" grew and "expanded." Resp. 3; Mot. 8. In other words, the Billing Contract governed the means by which the Parties carried out transactions under the Commission Agreement and in furtherance of their expansive "business relationship" in general. Resp. 3; Mot. 8. As detailed above, Plaintiff's claims for RICO

---

[6] The *Thompson* court found that a contract provision reading, "any disputes 'shall be governed by the laws of the State of California' and 'shall be resolved exclusively by final and binding arbitration in the City of San Jose, County of Santa Clara, State of California'" was "not a forum selection clause" because it did not "mandate that disputes arising from this contract be litigated in California; it merely state[d] that disputes shall be governed by the laws of the State of California and shall be resolved exclusively by final and binding arbitration in California." 998 F. Supp. at 741-44. Nevertheless, the Court agrees with the majority of case law analyzing similar clauses, cited *supra*. *Thompson* is not binding authority on this Court, nor did the opinion cite any authority, persuasive or mandatory, in support of the proposition at issue. Indeed, Defendants do not cite *Thompson* and raise no challenge to the validity of the Forum Selection Clauses, disputing only their scope.

violations, conspiracy, fraud, and theft all "hinge" on the Defendants' alleged abuse of the Parties' contractual, business relationship.[7] *Micropower*, 953 F. Supp. 2d at 808. In sum, HOGS, Gabali, and DH are subject to personal jurisdiction in Texas for Plaintiff's claims because they consented by signing the Forum Selection Clauses in one or both of the Agreements.

   *ii.  Non-Signatory Defendants*

   Defendants argue that the Forum Selection Clauses cannot bind Great Lakes, J&K, Consortium Laboratory, Alam, Encore, or S Alam Lab Services (collectively, the "Non-Signatory Defendants") because they did not sign the Agreements. Reply 4. The Fifth Circuit's recent decision in *Franlink Inc. v. BACE Services, Inc.* controls. 50 F.4th 432 (5th Cir. 2022). "To bind a non-signatory to a forum selection clause . . . 'the party must be closely related to the dispute such that it becomes foreseeable that it will be bound.'" *Id.* at 441 (quoting *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993)). There are four factors to consider in determining whether the non-signatory is closely related: "(1) common ownership between the signatory and the non-signatory, (2) direct benefits obtained from the contract at issue, (3) knowledge of the agreement generally and (4) awareness of the forum selection clause particularly." *Id.* (citing *Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436 (7th Cir. 2012)).

   1.  Great Lakes, J&K, and Consortium Laboratory

   Defendants Great Lakes, J&K, and Consortium Laboratory are all "closely related" to the underlying dispute and to Signatory Defendants Gabali, HOGS, and DH. *Franklink*, 50 F.4th at 441. In *Franklink*, the Fifth Circuit found that the first factor weighed in favor of binding a non-

---

[7] The Court need not determine the full scope and limitations of the Billing Contract Forum Selection Clause at this time. Hypothetically, a claim so attenuated, with a factual basis so far removed that it could not fall within the scope of the Billing Contract Forum Selection Clause, could conceivably materialize between the Parties. But that scenario is not presently before this Court. If the Billing Contract Forum Selection Clause is not broader than the Commission Agreement Forum Selection Clause, it is at least as broad. Plaintiff's claims are far from attenuated, and they arise out of the same operative facts as the formation and performance of both Agreements.

signatory defendant whose owner also owned a signatory to the forum selection clause. *Id.* at 443. The Parties do not dispute that Gabali, a signatory to the Commission Agreement, owns Non-Signatory Defendants Great Lakes and J&K. Mot. 7-8, n.1-4. Gabali also owns Billing Contract Signatory Defendant DH. *Id.* at 7, n.2. And it is undisputed that Gabali owned Consortium Laboratory during the relevant time and only transferred his ownership interest in 2021 and 2022. Resp. 4. Plaintiff also alleges that Gabali created Consortium Laboratory with Plaintiff's input and investment. First Am. Compl. 9, ¶ 35. While Defendants claim that "Consortium had no business dealing whatsoever with Energium" and that it is owned by a nonparty to this suit, the Court must accept Plaintiff's "uncontroverted allegations, and resolve in its favor all conflicts." Mot. 2, ¶ 6; *Id.* at 10, n.6; *Alpine View Co.*, 205 F.3d at 215. This factor weighs in favor of finding the Forum Selection Clauses to be binding.

Moreover, Gabali "obviously" enjoyed a direct economic benefit under the Commission Agreement as a signatory and under the Billing Contract as the owner of DH, which he "transferred, at least in part," to Great Lakes, J&K, and Consortium Laboratory. *Franklink*, 50 F.4th at 443. Plaintiff has alleged that Great Lakes and J&K were aware of the terms of the Commission Agreement and the Billing Contract. First Am. Compl. 10, ¶ 37 (alleging that Gabali used Great Lakes to order supplies from Plaintiff in the manner described by the Commission Agreement and that Plaintiff paid advance commissions to J&K in the manner described by the Commission Agreement and the Billing Contract). Consortium Laboratory, through its owner and operator, Gabali, was also aware of the terms of the Commission Agreement and the Billing Agreement. *Id.* at 12, ¶ 46 (alleging that Gabali convinced Plaintiff to establish Consortium Laboratory to serve "major testing contracts with Delta Airlines, United Airlines, and Meijer Supermarkets" and maximize all Parties' profits under the Commission

Agreement and Billing Contract). As to the last element, neither party presents evidence tending to show whether any of the Defendants were aware of the Forum Selection Clauses specifically.

The Court finds that the first three factors weigh in favor of binding Great Lakes, J&K, and Consortium Laboratory to the Forum Selection Clauses and that the fourth factor is neutral. Accordingly, Great Lakes, J&K, and Consortium Laboratory are bound to the Forum Selection Clauses and subject to personal jurisdiction in this Court.

        2.   Alam, Encore, and S Alam Lab Services

As for the rest of the Non-Signatory Defendants, the *Franklink* analysis also weighs in favor of enforcement. In *Frietsch v. Refco, Inc.*, the Seventh Circuit found that a non-signatory defendant was "closely related" enough to invoke a forum selection clause where the defendant's partners' affiliates were signatories to the relevant contract. 56 F.3d 825, 827 (7th Cir. 1995). Here, Defendants confirm that Alam partnered with Gabali to form Great Lakes and owns Encore. Mot. 7, 9 n.5. Plaintiff alleges that Alam owns S Alam Lab Services. First Am. Compl. 26, ¶ 116. While Defendants claim that S Alam Lab Services "does not exist," Plaintiff maintains that, at a minimum, Defendants used the name in the course of their scheme and that Alam used a credit card belonging to S Alam Lab Services to make partial payments to Plaintiff for supplies delivered to Encore in accordance with the Commission Agreement and the Billing Contract. Mot. 17, ¶ 10; Resp. 4; First Am. Compl. 10, ¶ 37.

In addition, Alam, Encore, and S Alam Services enjoyed direct benefits under the Commission Agreement and Billing Contract. According to Plaintiff, Alam and Gabali worked together to use Great Lakes to order supplies from Plaintiff, all while Gabali was having them delivered to Encore. First Am. Compl. 10, ¶ 37. Then, Alam would make partial payments for the supplies using S Alam Services' credit cards. *Id.* According to Plaintiff, these various

business entities served as a system of shields to protect Alam and Gabali while they reaped the benefits of the Commission Agreement and the Billing Contract and avoided their corresponding obligations. *Id.* at 28, ¶¶ 132-34.

Plaintiff has alleged that Alam, through his partnership with Gabali and ownership of Great Lakes, knew about the Commission Agreement and the Billing Contract, which is imputed to the other entities owned by Alam, Encore and S Alam Services. *Id.* at 10, ¶ 35 (alleging that Alam deferred "all potential business and revenues [from Consortium Laboratory] to Encore Diagnostics Laboratory by stealing [Plaintiff's] instruments and equipment"); *Id.* at 14, ¶ 53 (alleging that Alam falsely claimed that COVID-19 testing supplies sent by Plaintiff to Encore as described by the Commission Agreement arrived expired in a ploy to avoid paying for the supplies in accordance with the Commission Agreement and the Billing Contract).

The Court finds that the first three factors weigh in favor of binding Alam, Encore, and S Alam Lab Services to the Forum Selection Clauses and that the fourth factor is neutral. Accordingly, Alam, Encore, and S Alam Lab Services are bound to the Forum Selection Clauses and subject to personal jurisdiction in this Court.

## B. *RICO*

Even if Defendants were not subject to personal jurisdiction through the Forum Selection Clauses, they would be subject to personal jurisdiction in this Court under RICO's national service of process provision and through pendent personal jurisdiction over Plaintiff's related state law claims. "A federal court obtains personal jurisdiction over a defendant if it is able to serve process on him." *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 538 (9th Cir. 1986). "In order for a court to validly exercise personal jurisdiction over a non-resident defendant: (1) a statute must authorize service of process on the non-resident defendant; and

(2) the service of process must comport with the Due Process Clause." *In re Celotex Corp.*, 124 F.3d 619, 627 (4th Cir. 1997).

The RICO statute, 18 U.S.C. § 1965, "separately provides for service of process and personal jurisdiction." *Gonzalez v. Bank of Am. Ins. Servs., Inc.*, 454 F. App'x 295, 300 n.6 (5th Cir. 2011). A circuit split persists on the issue of which subsection of § 1965 confers nationwide service of process. *See generally Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 779 (N.D. Tex. 2008) (describing nature of circuit split). While the Fourth and Eleventh Circuits have held that § 1965(d) authorizes nationwide service of process, the majority of circuits considering the question have concluded that § 1965(b) grants nationwide service of process. *Id.* This distinction is relevant because the § 1965(b) courts read the statute to limit nationwide service of process to other defendants only after the plaintiff can establish personal jurisdiction of at least one defendant under § 1965(a). *Id.* at 779-80.

Because the Fifth Circuit has not yet weighed in, the Court looks to other Courts of Appeals and district courts. *See id.* at 779. Thus, in accordance with the majority of circuits and the *Rolls-Royce* court's interpretation of *Caldwell v. Palmetto State Savings Bank of South Carolina*, 811 F.2d 916 (5th Cir. 1987), § 1965(b) requires plaintiffs to establish personal jurisdiction over at least one defendant under § 1965(a) before the other RICO defendants can be subject to nationwide service of process under § 1965(b). *Rolls-Royce*, 576 F. Supp. 2d at 780.

    *i.*    *Section 1965(a)*

Section 1965(a) provides that RICO claims may be brought in any federal district "in which [the defendant] resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). In *Caldwell*, the Fifth Circuit recognized that "[a] number of district courts have held that this language requires that a defendant be conducting business in the forum." 811 F.2d at

17

918 (holding that a single letter mailed from South Carolina defendants to Texas plaintiffs was insufficient to show that defendants "conduct[ed] business in Texas," especially where plaintiffs initially solicited the transactions underlying their RICO claims). From a practical standpoint, many district courts have "construed § 1965(a)'s 'transacts his affairs' language to require traditional minimum contacts analysis under the state's long arm statute." *Harvest Nat. Res., Inc. v. Ramirez Carreno*, No. CV H-18-483, 2020 WL 3063940, at *6 (S.D. Tex. June 9, 2020) (quoting *Rolls-Royce*, 576 F. Supp. 2d at 780); *see also ESPOT, Inc. v. MyVue Media, LLC*, 492 F. Supp. 3d 672, 691 (E.D. Tex. 2020) (exercising personal jurisdiction over RICO defendants where one defendant allegedly committed mail and wire fraud through misrepresentations made via phone to the plaintiff "whom he knew to be in Texas").

Here, Plaintiff contends that Gabali committed mail and wire fraud in furtherance of the alleged scheme to defraud Plaintiff by creating fraudulent invoices on behalf of DH to avoid paying for Plaintiff's products, lying to Plaintiff via "phone calls, text messages through WhatsApp, and emails" to induce Plaintiff to advance commission payments through HOGS and J&K, and convincing Plaintiff to invest in Consortium Laboratory, only to misappropriate the supplies and equipment purchased by Plaintiff in the name of other business entities, such as Encore, and then refuse to pay Plaintiff back or share any associated revenue with Plaintiff. First Am. Compl. 19, ¶ 77; *id.* at 14, ¶ 54; *id.* at 29, ¶ 136; *id.* at 17, ¶¶ 70-72.

Plaintiff further alleges that Alam committed mail and wire fraud in furtherance of the alleged scheme by falsely claiming via email, on behalf of Encore, that Plaintiff sent expired products in order to convert them without payment. *Id.* at 19, ¶ 79. Alam also allegedly used Encore to convert supplies originally sent by Plaintiff to Great Lakes and used the S Alam

Services line of credit to make partial payments on behalf of Encore and Great Lakes to shield those entities, Gabali, and himself from liability. *Id.* at 25, ¶ 113; *id.* at 26, ¶ 116.

According to Plaintiff, Defendants directed all of these intentional acts at Plaintiff, "whom [they] knew to be in Texas[.]" *ESPOT*, 492 F. Supp. 3d at 691. Given the long-term "business relationship" that grew between Defendants and Plaintiff, Defendants at a minimum "conduct[ed] business" and "transacted [their] affairs" with Plaintiff in Texas. Mot. 8; *Caldwell*, 811 F.2d at 918. Therefore, Plaintiff has alleged sufficient contacts between Defendants and Texas to make a prima facie showing that Defendants are subject to personal jurisdiction in this Court for Plaintiff's RICO claim. For the reasons stated *infra* in section II.C.ii., the Court finds that Defendants have failed to rebut Plaintiff's prima facie case. Thus, at least one Defendant is subject to personal jurisdiction in this Court under § 1965(a).

ii.     *Section 1965(b)*

Once the § 1965(a) threshold is met, § 1965(b) then "allow[s] for nationwide service of process and personal jurisdiction over any other party," as long as the "ends of justice" so require. *ESPOT*, 492 F. Supp. 3d at 685 (citing *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998)). "The meaning of the 'ends of justice' is also unresolved in the Fifth Circuit." *Id.* at 686. Some courts hold that plaintiffs must "show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators." *Butcher's Union*, 788 F.2d at 539. Others interpret the phrase broadly "in light of the congressional directive to 'liberally construe[] [RICO] to effectuate its remedial purposes[.]'" *ESPOT*, 492 F. Supp. 3d at 686 (quoting *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1231 (10th Cir. 2006)); *see also Rolls-Royce*, 576 F. Supp. 2d at 782 (adopting the reasoning of the

*Cory* court and holding ends of justice required exercise of personal jurisdiction over all RICO

defendants).

In this case, while Defendants argue that a Michigan court would have personal

jurisdiction over all Defendants, Gabali, HOGS, and DH waived "any objection to venue and

personal jurisdiction" when they signed the Agreements containing the Forum Selection Clauses.

*Kevlin*, 46 F.3d at 15. Moreover, Gabali, on behalf of DH, signed the Billing Contract Forum

Selection Clause, which is mandatory. *See id.* at 14 (holding that forum selection clause

providing that "[t]he legal venue of this contract and any disputes arising from it shall be settled

in Dallas County, Texas" was mandatory); *see also Taylor v. Titan Midwest Const. Corp.*, 474

F.Supp. 145, 146, 148 (N.D. Tex. 1979) (transferring claims where forum selection clause

provided that "if any controversy or claim arises out of or relates to this Subcontract or any

alleged breach thereof jurisdiction and venue shall be in the appropriate Court . . . sitting within

the County in which the principal offices of Contractor are located"). Although a Michigan court

might not technically *lack* personal jurisdiction over Plaintiff's RICO claim against DH, only a

Texas court can *exercise* jurisdiction over it. *See Weber v. PACT XPP Techs., AG*, 811 F.3d 758,

768 (5th Cir. 2016) (holding that a mandatory forum selection clause "affirmatively requires that

litigation arising from the contract be carried out in a given forum").

"In a RICO action, the 'ends of justice' require nationwide service of process to further

the Congressional intent of allowing 'plaintiffs to bring all members of a nationwide []

conspiracy before a court in a single trial.'" *Allstate Ins. Co. v. Plambeck*, No. 3-08-CV-0388-M,

2009 WL 347423, at *3 (N.D. Tex. Feb. 11, 2009) (quoting *Butcher's Union*, 788 F.2d at 539).

Because Plaintiff and the Signatory Defendants "contracted in advance to litigate disputes in a

particular forum," it would be unfair to "disrupt the parties' settled expectations." *Atlantic*

*Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 66 (2013) (finding that "'the interest of justice' is served by holding parties to their bargain" (internal citations omitted)). Given the close connections between the Signatory Defendants, the Non-Signatory Defendants, Plaintiff, and the dispute, the ends of justice also require haling the Non-Signatory Defendants into this forum. *See L-3 Servs., Inc. v. Szekely*, No. 2:10CV350, 2010 WL 11579457, at \*11 (E.D. Va. Sept. 24, 2010) (holding that where one defendant signed a mandatory forum selection clause, the ends of justice required subjecting remaining defendants to personal jurisdiction in the designated forum).

### iii.    *Pendent Personal Jurisdiction*

Plaintiff's state law claims are subject to pendent personal jurisdiction because they arise out of the "same nucleus of operative fact" as Plaintiff's RICO claim. *ESPOT*, 492 F. Supp. 3d at 700. "When a court has personal jurisdiction over the defendant on one claim, the court can exercise pendent personal jurisdiction over the same defendant on all other claims arising out of the same nucleus of operative fact." *Id.* (citing *Rolls-Royce*, 576 F. Supp. 2d at 783); *see also EuroTec Vertical Flight Sols., LLC. v. Safran Helicopter Engines S.A.A.*, No. 3:15-CV-3454-S, 2019 WL 3503240, at \*13 (N.D. Tex. Aug. 1, 2019) (exercising pendent personal jurisdiction over tort claims where the defendant allegedly "conspired with" other entities to engage in the underlying tortious conduct).

Here, all of Plaintiff's claims arise under the same circumstances: Defendants allegedly created a scheme to defraud Plaintiff that involved fraudulently inducing Plaintiff to invest in supplies, inventory, equipment, a laboratory, a call center, and a warehouse through misrepresentations about the need to service large contracts, stealing the investments, and using the Business Entity Defendants, counterfeit invoices, and false claims of faulty shipments to

shield themselves from having to repay or split returns with Plaintiff. First Am. Compl. 26-32, ¶¶ 120-53. Therefore, Defendants are subject to personal jurisdiction in this Court for all of Plaintiff's claims.

### C. *Minimum Contacts*

Even if Defendants were not subject to personal jurisdiction through the Forum Selection Clauses or pendent personal jurisdiction, Plaintiff has also pleaded the requisite minimum contacts between Defendants, the dispute, and Texas to render them subject to personal jurisdiction in this Court on Plaintiff's state law claims. "In order for a . . . court to exercise specific jurisdiction, 'the suit' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*.'" *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017) (first alteration added) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)). "Such activity or occurrence must 'create a substantial connection with the forum State,'" and without such "connection, 'specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State.'" *Inmar Rx Sols., Inc. v. Devos, Ltd.*, No. 18-11443, 2019 WL 4440400, at *2 (5th Cir. Sept. 16, 2019) (first quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014); and then quoting *Bristol-Myers Squibb*, 137 S. Ct. at 1781)).

In evaluating whether due process allows the exercise of specific jurisdiction, courts consider:

> (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019) (quoting *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006)). The minimum contacts analysis

is fact intensive, and the touchstone is "whether the defendant's conduct shows that it 'reasonably anticipates being haled into court'" in the forum state. *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009) (quoting *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 470 (5th Cir. 2006)).

    *i.    Defendants' Forum-Related Contacts*

    "A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Walden*, 571 U.S. at 286. Plaintiff bears the initial burden to show that Defendants' alleged forum-related contacts are sufficient to support each cause of action because "specific jurisdiction is a claim-specific inquiry." *Dontos v. Vendomation NZ Ltd.*, 582 F. App'x 338, 343 (5th Cir. 2014) (quoting *Seiferth*, 472 F.3d at 274) (cleaned up).

    1.  Civil Conspiracy

    While "[t]he unilateral activity of those who claim some relationship with a non-resident defendant cannot satisfy the requirement of contact with the forum state[]" in a conspiracy action, the Fifth Circuit has held a court has personal jurisdiction over non-resident co-conspirators where the complaint "contain[s] sufficient information to show that a valid claim for relief has been stated." *Thomas v. Kadish*, 748 F.2d 276, 282-83 (5th Cir. 1984); *see also Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 632 (5th Cir. 1999). In *General Retail Services, Inc. v. Wireless Toyz Franchise, LLC*, the Texas plaintiffs alleged that the defendants, all Michigan business entities and the owners and officers thereof, "engaged in a conspiracy to: (1) induce the plaintiffs to invest in a franchise; (2) enrich themselves at the plaintiffs' expense; and (3) 'asphyxiate' the plaintiffs once they asserted their legal rights by withholding their commissions and residual payments." 255 F. App'x 775, 781 (5th Cir. 2007). The district court dismissed the

plaintiffs' claims against the owners and officers for lack of personal jurisdiction. *Id.* The Fifth Circuit upheld the district court's dismissal as to three of the individual defendants because nothing in the plaintiffs' complaint "ascribe[d] specific conduct or statements to" any of them, merely mentioning their names, roles, and that one of them "met" with a plaintiff. *Id.* At 793. However, the district court's dismissal as to a fourth individual defendant, Simtob, was reversed because the complaint stated that he drafted and sent the materials containing the alleged misrepresentations to plaintiffs in Texas, presented the plaintiffs with the Franchise Agreement in Texas, and accepted the executed Franchise Agreement and franchise fee in Texas. *Id.* at 794.

Similar to the defendant Simtob in *Wireless Toyz*, Gabali's alleged contacts with Plaintiff in Texas are sufficient to support personal jurisdiction on Plaintiff's conspiracy claim. Plaintiff "ascribes specific conduct [and] statements to" Gabali, such as his demands that Plaintiff "build[] infrastructure and for a full-fledged call center / warehouse to support a new laboratory for testing needed for supposed new contracts through Gabali's companies[,]" his presentation of a sales revenue plan to Plaintiff that "served as a basis to advance a commission draw worth $130,860 which he collected[,]" and his request that Plaintiff "build an inventory of products worth two million dollars" for Defendant DH "while knowing that he was planning to dissolve [DH] and divert business to other entities." First Am. Compl. 7, ¶ 22; *id.* at 11, ¶ 44.

Although Alam's contacts with Plaintiff appear to be "less substantial" than Gabali's, Defendants concede that he maintained "an ongoing relationship" with Plaintiff. *Trinity Indus., Inc. v. Myers & Assocs.*, Ltd., 41 F.3d 229, 231 (5th Cir. 1995) (holding that Texas plaintiff's former lawyers were subject to personal jurisdiction on conspiracy claim because they "purposefully availed themselves of the privilege of doing business in Texas" through their representation of the plaintiff on different matters over a period of ten years). Plaintiff contends

that both Gabali and Alam repeatedly misrepresented their roles within the Business Entity Defendants and sent fraudulent invoices to Plaintiff in Texas to evade paying their debts. First Am. Compl. 14, ¶ 54. And Defendants acknowledge that both Gabali and Alam directed orders and purchases of COVID-19 testing supplies from Plaintiff on numerous occasions throughout their "business relationship[,]" which "prospered for over a year." Mot. 6. Thus, Alam also maintained sufficient contacts with Plaintiff to subject him to personal jurisdiction in Texas.

The Fifth Circuit has also held nonresident business entities are subject to specific jurisdiction for conspiracy claims. In *Mississippi Interstate Express, Inc. v. Transpo, Inc.*, the Mississippi plaintiff, Mississippi Interstate, alleged that two California corporations, Transpo and Azcal, and a California individual, Zoller, conspired to "obtain the plaintiff's services for nothing." 681 F.2d 1003, 1011 (5th Cir. 1982). The complaint and its supporting affidavits and exhibits showed evidence that Zoller controlled Transpo, Azcal, and a third, nonparty Alabama corporation during the relevant time period. *Id.* While only Transpo contracted with Mississippi Interstate, sufficient minimum contacts with Mississippi were alleged against the other defendants. *Id.* For example, Transpo wired Mississippi Interstate a letter refusing to pay the amount it owed under its agreement with Mississippi Interstate and declaring its intent to pay Azcal and Zoller instead, purportedly to satisfy a fictitious liability owed by Mississippi Interstate to the nonparty Alabama corporation. *Id.*; *see also Black v. Acme Markets, Inc.*, 564 F.2d 681, 685 (5th Cir. 1977) (holding Texas court had personal jurisdiction over "out-of-state corporation which had made purchases of products originating in Texas amounting to nearly $1.5 million in a single year and is alleged to have engaged in a conspiracy [to depress the price of beef]").

Much like the plaintiff in *Mississippi Interstate*, Plaintiff alleges that Gabali, Alam, and the Business Entity Defendants conspired and acted in concert to obtain Plaintiff's products and capital "for nothing." 681 F.2d at 1011. Plaintiff asserts that either Gabali, Alam, or both, maintained some form of influence in each of the Business Entity Defendants during the relevant time period.[8] The First Amended Complaint "present[s] a considerable amount of detailed information in support of" Plaintiff's conspiracy claim, detailing how the Individual Defendants allegedly used their control over the Business Entity Defendants to avoid paying their debts to Plaintiff. Plaintiff avers that the Individual Defendants, like the defendants in *Mississippi Interstate*, fabricated liabilities purportedly owed to various Business Entity Defendants by Plaintiff to avoid acknowledging their own debts. *Guidry*, 188 F.3d at 633; 681 F.2d at 1011.

Specifically, Plaintiff alleges that Gabali and Alam used: (i) HOGS and DH to contract with Plaintiff and secure a set price and commission for COVID-19 testing supplies procured by Plaintiff, (ii) Great Lakes to order COVID-19 testing supplies from Plaintiff, (iii) S Alam Services to make partial payments to Plaintiff, (iv) HOGS and J&K to accept advance commission payments made by Plaintiff in reliance on Gabali's alleged misrepresentations, (v) Encore to accept delivery of Plaintiff's COVID-19 testing supplies and falsely accuse Plaintiff of providing expired COVID-19 testing supplies, (vi) Consortium to funnel Plaintiff's

---

[8] Defendants concede that Gabali owns Defendants DH, Great Lakes, HOGS, and J&K. Mot. 7 n.1, 8 n.2-4. Defendants also admit that Alam owns Encore and was Gabali's partner in forming Great Lakes. *Id.* at 7, 9 n.5. There are five Defendants about which some "confusion" remains. *Gen. Retail Servs., Inc.*, 255 F. App'x at 778 n.2. Defendants contend that Diagnostic Hematology and Diagnostic Hematology-Oncology are assumed names for DH. Mot. 8 n.2, and that Diagnostic Hematology-PLLC was terminated before the relevant time period. *Id.* at 10 n.6. While Defendants claim that S Alam Lab Services does not exist, Plaintiff responds that Defendants used this name "in the course of their scheme" by making partial payments to Plaintiff with a credit card issued to S Alam Service. *Id.* at 10; Resp. 4. And though Defendants state that Plaintiff never had any relationship with Consortium Laboratory, Plaintiff claims to have invested heavily in its establishment at Gabali's urging, who owned an interest in Consortium until 2022. Mot. 10 n.6, Resp. 4. For the purposes of this opinion, these distinctions are "immaterial." *Wireless Toyz*, 255 F. App'x at 778 n.2; *see also Mississippi Interstate*, 681 F.2d at 1011-12 (holding plaintiff made "at least a prima facie showing" that defendants conspired to defraud plaintiff despite discrepancies over ownership relationship between defendants).

investments and equipment to Encore, and (vii) DH to send "fraudulent invoices" to Plaintiff for "consulting services" to create an offset claim against the debts owed to Plaintiff by Defendants. First Am. Compl. 10, ¶ 37; Resp. 9-10, 13-14, ¶¶ 35, 51, 55. Thus, as to Plaintiff's conspiracy claim, "the due process requirements of sufficient contact with [Texas] and foreseeable involvement with its law are met by the intentional acts of the non-resident defendants." *Mississippi Interstate*, 681 F.2d at 1012.

    2. Fraud

The Fifth Circuit instructs that "the considerations for personal jurisdiction over fraud claims are different from those we apply in a straight contract claim." *Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 492 (5th Cir. 2018). In *Trois*, the Fifth Circuit found that an out-of-state defendant was subject to personal jurisdiction in Texas for a fraud claim that arose out of the defendant's alleged misrepresentations made during a single conference call. *Id.* at 491. Although the defendant did not initiate the conference call, he was "a willing participant who actively engaged in conversation regarding his business in a call to Texas." *Id.*

Here, Plaintiff, a Texas resident, alleges that it relied on fraudulent misrepresentations that Defendants Gabali and Alam communicated to Plaintiff in Texas on behalf of the Business Entity Defendants via "phone calls, text messages through WhatsApp, and emails." First Am. Compl. 14, ¶ 54. Such repeated, purposeful communications, directed toward Texas for over a year, meet the "minimum contacts" required by *Trois*. *Id.* at 492 (holding that alleged out-of-state tortfeasor's participation in a single conference call established the requisite minimum contacts to confer personal jurisdiction); *see also Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 212 (5th Cir. 1999) (finding defendant subject to personal jurisdiction where "numerous calls,

letters and faxes were made by [defendant] to [plaintiff] in Texas . . . contain[ing] the promises, assurances, and representations that are at the heart of the lawsuit[]").

Plaintiff's "cause of action arises out of or results from [Defendants'] forum-related contacts" also because its fraud claim is based on the content of Defendants' repeated communications with Plaintiff over the course of more than a year. *See Mississippi Interstate*, 681 F.2d at 1008. Plaintiff claims that Gabali, through HOGS, J&K, Great Lakes, DH, and Consortium Laboratory, induced Plaintiff to purchase large amounts of COVID-19 testing supplies and establish a laboratory, call center, and warehouse by claiming he needed the inventory and investments from Plaintiff to service lucrative testing contracts with various large companies. First Am. Compl. 6-7, ¶¶ 21, 22. Plaintiff further alleges that Gabali and Alam repeatedly misrepresented their roles within Great Lakes, Encore, and S Alam Services and, through DH, sent fraudulent medical invoices to Plaintiff in Texas to evade paying their debts. *Id.* at 14, ¶ 54. These allegations plainly cast Defendants as "willing participant[s] who actively engaged in conversation regarding [their] business[,]" purposely and knowingly directing their misrepresentations to a Texan victim. *Trois*, 882 F.3d at 491. Far from "random, fortuitous, or attenuated[,]" Defendants' communications with Plaintiff are purposeful enough to create a basis for personal jurisdiction in Texas over Plaintiff's fraud claim. *Walden*, 134 S.Ct. at 1123.

    3.  Theft

In Texas, "a nonresident is considered to be doing business in the state—and therefore is subject to personal jurisdiction—if it 'commits a tort in whole or in part in [Texas].'" *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 229 (5th Cir. 2012) (quoting TEX. CIV. PRAC. & REM. CODE § 17.042). When evaluating a defendant's contacts for purposes of exercising personal jurisdiction over a civil theft claim, "[t]he mere fact that the converted item

originated in Texas is not sufficient to create personal jurisdiction under the long-arm statute; the item must be in Texas when the conversion actually occurs." *Id.* at 230 (holding Texas court lacked specific jurisdiction over a conversion claim where defendant lawfully received dominion over software license in Germany and conversion only could have occurred in Germany when defendant refused to return its copy of the software). Nonetheless, there is an exception to this rule where the plaintiff's theft claim "arises out of or relates to a long-term contract that was formed as a result of the defendant's purposeful efforts to create an ongoing business relationship with the plaintiff in Texas." *The Leader's Inst., LLC v. Jackson*, No. 3:14-CV-3572-B, 2015 WL 4508424, at *14 (N.D. Tex. July 24, 2015) (cleaned up).

In *Leader's*, after a falling out with the Texas plaintiff, the Indiana defendant attempted to reestablish a business relationship with the plaintiff through "persistent pleading" over the telephone and in person. *Id.* at *2. The plaintiff eventually acquiesced and rehired the defendant pursuant to an independent contractor agreement that barred the defendant from using the customer list to compete with the plaintiff. *Id.* at *2. The defendant conducted most of his work for the plaintiff remotely from Indiana, including accessing the customer list that would later form the basis of the plaintiff's theft claim. *Id.* at *13.

The *Leader's* court found that although much of the defendant's "alleged misconduct occurred" outside the state of Texas and "after [the ongoing business relationship with plaintiff] ended," the parties' dispute nonetheless "grew directly out of a contract which had a substantial connection with [Texas]." *Id.* at *14 (quoting *Burger King Corp. v. Rudzewicz*, 417 U.S. 462, 479 (1985)). In holding that the Indiana defendant was subject to specific personal jurisdiction in Texas for theft, the court emphasized the defendant's "purposeful actions—in particular, his repeated pleas to [the plaintiff] in Texas, both over the phone and in person—that led to the

formation of the parties' long-standing business relationship underlying the state law claims at issue." *Id.* at *13.

Similarly, the court in *Bates Energy Oil & Gas v. Complete Oilfield Services*, held that the defendant "should have reasonably anticipated being haled into Texas court for claims such as fraud, theft, [and] conspiracy" even though "the only act attributable to him occurred entirely within the state of Wisconsin." 361 F. Supp. 3d 633, 649, 647 (W.D. Tex. 2019). The *Bates* court found the defendant's contacts supported the exercise of personal jurisdiction in Texas where he allegedly "conspir[ed] to purposefully target" funds held in a Texas escrow account, misrepresented its corporate employer and fellow defendant's ability to provide frac sand to the plaintiff "to induce [the plaintiff] . . . to keep its money in the Texas escrow account" "so that the members of the conspiracy could steal the funds," and established and exploited an LLC "to create fraudulent invoices . . . that were used to misappropriate the specific funds from the Texas escrow account, both without [the plaintiff's] consent and with its fraudulently obtained consent." *Id.* at 648-49.

Defendants purposely availed themselves of the benefits of doing business with Plaintiff in Texas when, as Defendants admit, they directed numerous orders and purchases of COVID-19 testing supplies from Plaintiff throughout their "business relationship[,]" which "prospered for over a year." Mot. 6. Like in *Leader's*, Plaintiff's theft claim "arises out of or relates to the long-term contract that was formed as a result of [Defendants'] purposeful efforts to create an ongoing business relationship with [Plaintiff] in Texas" because, according to the First Amended Complaint, Defendants "enticed" Plaintiff to send the allegedly stolen inventory and equipment with "promises of more potential business," "create[ing] a sense of urgency." 2015 WL 4508424, at *14 (cleaned up); First Am. Compl. 11, 28, ¶¶ 44, 133.

Although Defendants' alleged conversion was not consummated in Texas, the theft "nonetheless 'grew directly out of a contract which had a substantial connection with [Texas]'" and would not have occurred but for the Defendants' purposeful "efforts to reach into the forum state and [induce] a forum resident [to do business with Defendants in reliance on their alleged misrepresentations], even though these contacts all occurred before the misconduct at issue took place." *Leader's*, 2015 WL 4508424, at *14 (quoting *Burger King*, 417 U.S. at 479 (citation, quotation marks, and emphasis omitted)). Thus, the Court finds that Defendants' contacts with Plaintiff support the exercise of personal jurisdiction over Plaintiff's theft of inventory and equipment claim because "the nature of [their] contacts suggest[] [they] purposefully availed [themselves] of the privileges of this forum[]" in service to the alleged theft. *Id.*

As for the theft of money claim, Plaintiff alleges that "fake documents were directed to Texas to further a fraudulent scheme" and that Defendants "cause[d] the transfer of specified funds in a Texas account out of the account to participants in the scheme." *Bates*, 361 F. Supp. 3d at 649. Like in *Bates*, Plaintiff contends that Gabali and Alam sent fraudulent invoices to Plaintiff in Texas to evade paying their debts and that Gabali intentionally made "misrepresentations" designed to induce Plaintiff to "advance a commission draw worth $130,860 which he collected." First Am. Compl. 14, ¶ 54. Such encounters "are not fortuitous contacts with Texas based on the unilateral acts of . . . third parties, and go beyond mere injury in Texas, instead establishing that [Defendants'] conduct connects [them] to Texas in a meaningful way." *Bates*, 361 F. Supp. 3d at 649.

4.  Contacts Through Agreements

Defendants argue that the Agreements do not confer personal jurisdiction over them because merely contracting with an out-of-state party is not sufficient to establish minimum

contacts, Plaintiff's claims fall outside the scope of the Agreements' Forum Selection Clauses, and not all the Defendants are bound by the Agreements. Mot. 13-14; Reply 3-4. The Court disagrees. Defendants' communications alone provide the requisite nexus between their intentional conduct, the forum, and Plaintiff's claims. *Mississippi Interstate*, 681 F.2d at 1008 (finding noncontracting defendants subject to personal jurisdiction because plaintiff implicated all defendants in alleged fraudulent conspiracy to obtain plaintiff's services for free).

The only controlling authority Defendants cite to support the argument that their alleged conduct fails the minimum-contacts test is *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, which is distinguishable for two reasons. 481 F.3d 309, 311 (5th Cir. 2007). First, *Moncrief*'s holding that "merely contracting with a resident of the forum state does not establish minimum contacts[]" only applied to the plaintiff's breach of contract claim, not its tort claim. *Id.*; *see also Trois*, 882 F.3d at 490 ("[T]he minimum-contacts test for personal jurisdiction in fraud differs from that in contract."). Second, *Moncrief* found no personal jurisdiction over the plaintiff's negligent misrepresentation claim because the alleged false statement involved a promise of future behavior. 481 F.3d at 314. While Texas law requires negligent misrepresentation claims to allege a misstatement of an existing fact, no such condition restricts claims for intentional, fraudulent statements. *Compare id.* (citing *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 357 (5th Cir. 1996) (applying Texas law)) *with Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983) ("An expression of an opinion as to the happening of a future event may also constitute fraud where the speaker purports to have special knowledge of facts that will occur or exist in the future.").

Plaintiff alleges that Defendants' conduct was intentional and knowing, not negligent. First Am. Compl. 30-31, ¶¶ 144-46. Further, Plaintiff claims that Defendants misrepresented

existing facts repeatedly. *Id.* at 14, ¶ 53 (alleging that Alam falsely claimed COVID-19 test supplies sent by Plaintiff were expired to avoid paying for them); *id.* at 14, ¶ 54 (alleging that Gabali and Alam misrepresented their roles in the Business Entity Defendants to avoid paying Plaintiff's invoices); *id.* at 15, ¶¶ 57-61 (alleging that Gabali produced and mailed several fictitious invoices to Plaintiff to avoid paying debt to Plaintiff). Defendants acknowledge that both Gabali and Alam directed orders and purchases of COVID-19 testing supplies from Plaintiff on numerous occasions throughout their "business relationship[,]" which "prospered for over a year." Mot. 6. Therefore, Plaintiffs have met their burden to establish a prima facie case of personal jurisdiction over all claims and all Defendants.

### ii. *Fairness Factors*

Once the plaintiff demonstrates that the defendant has minimum contacts with the forum and that the action arises out of those contacts, the burden shifts to the defendant to show that the exercise of jurisdiction is "unfair and unreasonable." *Sangha*, 882 F.3d at 102. In determining whether the defendant has carried this burden, the Court balances five factors: (1) the burden on the nonresident defendant of having to defend itself in the forum; (2) the interests of the forum state in the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the states in furthering fundamental social policies. *Id.*

"[T]he exercise of personal jurisdiction is fair and reasonable" because Defendants have not "present[ed] a compelling case that the presence of some considerations would render jurisdiction unreasonable." *Burger King Corp.*, 471 U.S. at 477 (1985). Defendants offer only conclusory restatements of the law relating to the interests of Texas in adjudicating this case, the interstate judicial system's interest in the most efficient resolution of controversies, and the

fundamental social policies of the forums at issue. Mot. 14-15. The only controlling authorities they cite are the Fifth Circuit's opinion in *Moncrief*, which declined to analyze the fairness factors after finding the defendants lacked sufficient minimum contacts with the forum state, 481 F.3d at 314-15, and *McFadin*, which found that the fairness factors weighed in favor of subjecting out-of-state tortfeasors to personal jurisdiction. 587 F.3d at 763.

As stated in the *McFadin* opinion, "once minimum contacts are established, the interests of the forum and the plaintiff justify even large burdens on the defendant." 587 F.3d at 764. Offering no supporting facts, Defendants reference "the burden on Defendants to litigate in Texas," but "generalized difficulty" associated with litigating in another state is not "a burden violative of due process." Mot. 15; *McFadin*, 587 F.3d at 764. Further, "Texas has an interest in protecting its residents' property rights and providing a convenient forum for its residents to resolve their disputes." *Id.* at 763. Plaintiff, a Texas resident, has "an obvious interest in securing relief as quickly and as efficiently for [itself] as possible." *Id.* Moreover, "it is unlikely that efficient resolution of this case would be disserved by resolution in Texas as opposed to [Michigan]." *Id.* While Defendants argue that relevant evidence is located in Michigan, it is not their position that "[t]he evidence at issue is [] difficult to transport" or that there would be a "significant burden on the [C]ourt in hearing this case in Texas." *Id.* at 763-64.

Three Defendants signed agreements designating Texas as the chosen forum to resolve disputes with Plaintiff. And "when combined with the . . . long-term relationship Defendants established with Plaintiff in Texas," the Forum Selection Clauses "reinforce [Defendants'] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." *Burger King Corp.*, 471 U.S. at 482. Accordingly, the Court finds Defendants failed to carry their burden to "present a compelling case that the presence of some considerations would

render jurisdiction unreasonable." *Id.* at 477. Thus, accepting Plaintiff's "uncontroverted allegations, and resolv[ing] in its favor all conflicts[,]" the Court finds that Defendants have failed to rebut Plaintiff's prima facie case that Defendants are subject to minimum-contacts specific personal jurisdiction in this Court for Plaintiff's claims as alleged. *Alpine View Co.*, 205 F.3d at 215.

## III.   VENUE TRANSFER

A party seeking transfer under 28 U.S.C. § 1404(a) "must show good cause by clearly demonstrating that a transfer is for the convenience of parties and witnesses, in the interest of justice." *Defense Distributed v. Bruck*, 30 F.4th 414, 433 (5th Cir. 2022) (quoting *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) [hereinafter *Volkswagen II*]) (cleaned up). District courts enjoy "broad discretion in deciding whether to order a transfer[,]" weighing private and public interest factors to determine whether the movant has established "good cause for transfer based on convenience and justice." *Volkswagen II*, 545 F.3d at 311 (quoting *Balawajder v. Scott*, 160 F.3d 1066, 1067 (5th Cir. 1998)); *Defense Distributed*, 30 F.4th at 433.

"The calculus changes, however, when the parties' contract contains a valid forum-selection clause," which must "be given controlling weight in all but the most exceptional cases." *Atlantic Marine*, 571 U.S. at 63 (cleaned up). Accordingly, the Supreme Court directs district courts to adjust their § 1404(a) analysis such that (1) "the party defying the forum-selection clause . . . bears the burden of establishing" that the forum selection clause should not control;[9] (2) the court "should not consider arguments about the parties' private interests;" and

---

[9] The *Atlantic Marine* opinion assumes that "the party defying the forum-selection clause" is a plaintiff who opposes transfer to the contractually-designated forum. 571 U.S. at 63. Yet in the present case, Plaintiff brought suit in the forum designated by the Forum Selection Clauses and seeks to enforce them, opposing Defendants' motion to transfer the case out of the specified forum. Thus, the weight ordinarily given to "plaintiff's venue privilege" remains intact. *Id.*

(3) "[w]hen a party bound by a forum-selection clause" files suit in a different forum, a § 1404(a) transfer of venue "will not carry with it the original venue's choice-of-law rules."[10] *Id.* at 63-65.

Where some parties have agreed to a forum selection clause and others have not, the calculus changes yet again. *In re Rolls Royce Corp.*, 775 F.3d 671, 681 (5th Cir. 2014). In that situation, the Fifth Circuit requires the Court to (1) cut all "private factors of the parties who have signed a forum agreement" in favor of the "contracted-for forum;"[11] (2) consider the private factors of the non-signatory parties under the typical § 1404(a) framework; and (3) "ask whether this preliminary weighing is outweighed by the judicial economy considerations of having all claims determined in a single lawsuit." *Id.*

While *Rolls Royce Corp.* nominally distinguishes between "parties who have signed a forum agreement" and "parties who have *not* signed a forum selection agreement[,]" the Court must view this language through the lens provided by the Fifth Circuit's recent opinion in *Franklink. Id.*; 50 F.4th 432. In *Franklink*, the Fifth Circuit adopted the "closely related" doctrine, which operates to equitably bind non-signatories to agreements if they are "closely related" to the contract. 50 F.4th at 435. Although the non-signatory defendants in *Franklink* filed a motion to dismiss for lack personal jurisdiction, not a § 1404(a) motion to transfer venue, the *Franklink* court relied heavily on a Third Circuit opinion that *did* involve a § 1404(a) transfer motion. *Id.* at 439; *In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 70 (3d Cir. 2018). The *McGraw-Hill* court found that, for purposes of a § 1404(a) motion, non-signatories who are bound to a forum selection clause by the "closely related" doctrine are treated exactly the same as signatories to the agreement under *Atlantic Marine*. *McGraw-Hill*, 909 F.3d at 70.

---

[10] This prong is also inapplicable given that Plaintiff filed suit in the contractually-designated forum.

[11] The procedural posture in *Rolls Royce Corp.* presented differently than the case at bar in that the single signatory defendant moved for a severance and transfer to the contractually-designated forum, which the plaintiff and the other two non-signatory defendants opposed. 775 F.3d at 674.

Here, Defendants do not challenge the validity of the Forum Selection Clauses, only their scope. Accordingly, the analysis for the Signatory Defendants is "easy" and "*Atlantic Marine* is clear—the Court cannot consider private-interest factors that counsel against transfer to the agreed-upon forum." *Rolls Royce Corp.*, 775 F.3d at 679. Moreover, for the reasons given in section II.A.ii *supra*, this Court finds that the Non-Signatory Defendants are also bound to the Forum Selection Clauses for purposes of Defendants' Motion to Transfer Venue Under § 1404(a) because they are "closely related" to the underlying Agreements. Applying the *Atlantic Marine* analysis, Defendants bear the burden to show that the Forum Selection Clauses should not control "as the party defying the forum-selection clause" and the Court shall "consider arguments about public-interest factors only." 571 U.S. at 64.

## A. *Public Interest Factors*

Because public interest factors "will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id.* Courts must consider (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law. *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) [hereinafter *Volkswagen I*] (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n. 6 (1981)).

### i.   *Court Congestion*

Defendants raise no arguments about court congestion. Mot. 20 ("[T]here are no concerns of court congestion.").

ii.    *Local Interest*

The local interest in having localized interests decided at home does not merely encompass the parties' connections to each forum, but "the significant connections between a particular venue and the events that gave rise to a suit." *Defense Distributed*, 30 F.4th at 435 (quoting *In re Apple Inc.*, 979 F.3d 1332, 1345 (Fed. Cir. 2020)). "Important considerations include the location of the injury, witnesses, and the Plaintiff's residence." *Id.*

Defendants argue that Michigan has more of a localized interest in deciding this case because "[t]he conduct at issue, including [Plaintiff's] shipping of spoiled goods with tampered expiration dates, Defendants' provision of consulting services, and payment discrepancies between both parties, all occurred in Michigan." Mot. 21. Plaintiff, pointing to the choice-of-law clauses in the Agreements (the "Choice-of-Law Clauses"), argues that Texas has a more substantial relationship with the dispute because "Texas is the place where [Plaintiff] is domiciled, where the alleged injuries occurred, where the parties' relationships were centered, where [Plaintiff] received the allegedly fraudulent representations, where [Plaintiff] acted on such representations, and where third parties (*e.g.* the FDA) acted on allegedly fraudulent representations." Resp. 24. The Parties each provide a list of potential witnesses located in Michigan and Texas. *Id.* at 18-19; Reply 9-10.

Although Plaintiff and Defendants identify potential witnesses located in both forums, Plaintiff's residence and the location of Plaintiff's alleged injury are both in Texas. Significantly, Defendants agreed to subject their business relationship with Plaintiff to the laws and courts of Texas in two separate agreements. Resp. 3. Because Texas has a localized interest in resolving a dispute involving a Texas resident allegedly injured in Texas, as well as enforcing forum selection agreements designating Texas jurisdictions, the Court finds that this factor weighs against transfer.

   *iii.*    *Familiarity of the Forum*

Before determining which forum is more familiar with the law that will govern the case, the Court addresses whether Texas or Michigan law applies to Plaintiff's claims. As a threshold matter, the Court will ascertain whether the choice-of-law clause in the Commission Agreement (the "Commission Agreement Choice-of-Law Clause") or the choice-of-law clause in the Billing Contract (the "Billing Contract Choice-of-Law Clause") is dispositive of this issue.

      1.  Choice-of-Law Clauses

The Fifth Circuit has applied the law of the forum state to interpret the scope of a choice-of-law clause. *See Caton v. Leach Corp.*, 896 F.2d 939, 942 (5th Cir. 1990). Under Texas law, "[a] choice of law provision in a contract that applies only to the interpretation and enforcement of the contract does not govern tort claims." *Red Roof Inns, Inc. v. Murat Holdings, L.L.C.*, 223 S.W.3d 676, 684 (Tex. App.–Dallas 2007, pet. denied) (citing *Stier v. Reading & Bates Corp.*, 992 S.W.2d 423, 433 (Tex. 1999)). Unlike forum selection clauses, choice-of-law provisions are construed narrowly. *See Stier*, 992 S.W.2d at 433; *see also In re AutoNation, Inc.*, 228 S.W.3d 663, 669 (Tex. 2007) (refusing to "superimpose" Texas's interpretation of choice-of-law clauses onto "the law governing forum-selection clauses").

The Commission Agreement Choice-of-Law Clause does not apply to Plaintiff's tort claims because it provides that the Commission Agreement "was created and shall be interpreted based on the laws of the State of Texas." Resp. 3; *see Stier*, 992 S.W.2d at 433 (holding that tort claims fell outside the scope of a choice-of-law clause which provided that the contract "shall be interpreted and enforced in accordance with the laws of the State of Texas"). While the Billing Contract Choice-of-Law Clause is broader in scope, providing that "any dispute arising under [the Billing Contract] shall be settled with the application of Texas law[,]" Plaintiff's tort claims

still fall outside the scope of the clause according to Texas law on the interpretation of choice-of-law clauses. *See CPS Int'l, Inc. v. Dresser Indus., Inc.*, 911 S.W.2d 18, 25 (Tex. App.–El Paso 1995, writ denied) (applying United States law to contract claims, but not tort claims, where choice-of-law mandated that "any controversy, dispute, or question arising out of, or in connection with, or in relation to this Agreement. . . shall be determined in accordance with the Laws of the United States of America."). Accordingly, neither Choice-of-Law Clause disposes of the third public interest factor.

   2. Texas or Michigan Law

  The parties appear to concede that this factor weighs neutrally as to Plaintiff's RICO claim because it presents a federal question. Mot. 21; Resp. 23-24. However, they dispute whether Michigan or Texas law applies to Plaintiff's state law claims. Mot. 21-23; Resp. 23-24; Reply 11-12. "'In federal question jurisdiction cases, where a court is exercising supplemental jurisdiction over state-law claims, a federal court also applies the choice-of-law rules of the forum state to the state-law claims.'" *Marquis Software Sols., Inc. v. Robb*, No. 3:20-CV-0372-B, 2020 WL 955901, at *4 (N.D. Tex. Feb. 27, 2020) (quoting *In re Enron Corp. Sec., Derivative, & "ERISA" Litig.*, 511 F. Supp. 2d 742, 790 (S.D. Tex. 2005)). "Texas uses the [RESTATEMENT (SECOND) OF CONFLICT OF LAWS's] 'most significant relationship' test to decide choice-of-law issues." *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000). This test involves comparing the contacts between the parties, the forums, and the litigation, through the lens of policy factors listed in § 6 of the Restatement. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Am. Eurocopter Corp.*, 692 F.3d 405, 408 (5th Cir. 2012) (applying Texas law to conduct tort claim choice-of-law analysis).

The relevant contacts to consider in a tort case are "the place of injury, the place where the conduct causing the injury occurred, the domicile, residence, place of incorporation, and place of business of the parties, and the place where the parties' relationship is centered." *Torrington*, 46 S.W.3d at 848. Here, the place of injury is Texas and the place where the conduct allegedly causing the injury occurred is Michigan. That said, with respect to fraud-based claims, "[t]he place where a plaintiff relies on fraud may determine the choice of law." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 790 (Tex. 2005) (citing *Tracker Marine, L.P. v. Ogle*, 108 S.W.3d 349, 356 (Tex. App.–Houston [14th Dist.] 2003, no pet.) ("[T]he place where the defendant made representations and the place where the plaintiff received them are of equal importance, but both are outweighed by the place where the plaintiff acted in reliance."). Thus, because Plaintiff allegedly relied on Defendants' misrepresentations in Texas by sending advance commission payments, inventory, and equipment from its place of business in Texas, these contacts weigh in favor of applying Texas law.

Defendants' domicile, residence, place of incorporation, and place of business are in Michigan, and Plaintiff's are in Texas. Mot. 22; Resp. 2. But "the residence of the plaintiff is more important than that of the defendant, as the financial loss involved will usually be of greatest concern there." Mot. 22; *Tracker Marine, L.P.*, 108 S.W.3d at 356. Therefore, this contact also favors Texas law.

Despite Michigan's role as the ultimate destination of much of Plaintiff's capital, inventory, and equipment, the Parties chose to center their relationship around Texas through the Choice-of-Law Clauses. Although the wording of the Choice-of-Law Clauses is "not so broad as to require of its own force that Texas law apply to [Plaintiff's] claims," it still "reflect[s] a

decision on [the Parties'] part to center their relationship in Texas for choice-of-law purposes." *Nat'l Union Fire Ins. Co.*, 692 F.3d 405, at 409.

Considering that all contacts indicate that the forum with the most significant relationship to this litigation is Texas, the § 6 policy factors are unlikely to change that result. The Court finds that applying Texas law to Plaintiff's claims in accordance with the overwhelming predominance of Texas contacts serves "the needs of the interstate and international systems, the relevant policies of the forum, the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, the protection of justified expectations, the basic policies underlying the particular field of law, certainty, predictability and uniformity of result, and ease in the determination and application of the law to be applied." RESTATEMENT (SECOND) OF CONFLICT OF LAWS, § 6.

The third §1404(a) transfer public interest factor weighs against transfer.

*iv.    Conflict of Laws*

Neither party argues that litigating in either forum would present unnecessary problems of conflict of laws or in the application of foreign law.

The Court finds that Defendants have failed to overcome the *Atlantic Marine* presumption in favor of enforcing the Forum Selection Clauses. As a result, their Motion to Transfer Venue Under § 1404(a) succumbs on that basis alone.

### B. *Private Interest Factors of Non-Signatory Defendants*

Even if the Fifth Circuit's "closely related doctrine" did not bind all Defendants to the Forum Selection Clauses for the purposes of § 1404(a), the Non-Signatory Defendants still could not show that transfer is proper. Assuming that *Rolls Royce Corp.* applied to this scenario instead of *Franklink*, this Court would (1) cut all "private factors of the parties who have signed a forum

agreement" in favor of the "contracted-for forum;" (2) consider the private factors of the non-signatory parties under the typical § 1404(a) framework; and (3) "ask whether this preliminary weighing is outweighed by the judicial economy considerations of having all claims determined in a single lawsuit." 775 F.3d at 681. "The private interest factors are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Volkswagen II*, 545 F.3d at 315. The movant bears the burden to show that the transferee forum is "clearly more convenient." *Id.*

    *i.    Sources of Proof*

When weighing the first private interest factor, "[t]he location of evidence bears much more strongly on the transfer analysis when . . . the evidence is physical in nature." *In re Planned Parenthood Fed'n of Am., Inc.*, No. 22-11009, 2022 WL 16549164, at *3 (5th Cir. Oct. 31, 2022) (citing *Volkswagen II*, 545 F.3d at 316-17); *see also In re Radmax, Ltd.*, 720 F.3d 285, 288 (5th Cir. 2013) (holding that first private interest factor weighed in favor of forum where "documents and physical evidence" were located). Defendants argue that physical evidence such as "Plaintiff's moldy testing supplies and tampered expiration dates" and "Defendants' bank accounts, accounting and business records" can be found in Michigan. Mot. 19. Plaintiff contends that the alleged moldy testing supplies are relevant only to a potential counterclaim that Defendant has not brought in this action and that Plaintiff's bank accounts, business records, and the financial records in the custody of the Texas attorney pursuant to the Billing Contract are likewise located in Texas. Resp. 17.

Ultimately, this factor weighs in favor of transfer because Plaintiff admits that it shipped the vast majority of physical evidence in this case to Michigan. *Id.* at 23. Not only were all the

COVID testing supplies sent to Michigan, the laboratory, call center, and warehouse on which Defendants allegedly induced Plaintiff to spend millions of dollars are all located in Michigan. Further, the allegedly defective / expired / fraudulent testing supplies, located in Michigan, could be relevant to Plaintiff's claims and Defendants' defenses, not just a potential counterclaim against Plaintiff. For example, the supplies and their packaging could contain evidence tending to prove whether the supplies were actually tampered with and, if so, by whom. As such, the first private interest factor supports transfer.

  *ii. Compulsory Process*

   Both parties argue that more witnesses are subject to compulsory process in their preferred forum, including employee witnesses for each party. While Defendants allude generally to potential third-party witnesses located in Michigan, such as J.P. Morgan Chase employees and delivery service vendors, Plaintiff lists two potential Texas witnesses by name and specifies seven other Texas individuals by their employers. Reply 9; Resp. 18-19. That said, neither Defendants nor Plaintiff adequately explain how these potential witnesses could be relevant to the claims and defenses at issue in this case. Consequently, the Court finds that this factor weighs neutrally.

  *iii. Willing Witnesses*

   "When the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *Volkswagen I*, 371 F.3d at 204-05. Defendants do not attempt to estimate how many potential witnesses reside in Michigan as opposed to Texas. In contrast, Plaintiff lists two potential Texas witnesses by name and specifies seven other Texas individuals by their employers. Resp. 18-19. Nonetheless, as stated above,

neither Defendants nor Plaintiff adequately specify how these potential witnesses could be relevant to the claims and defenses at issue in this case. Thus, this factor remains neutral.

### iv. *Other Practical Problems*

Defendants argue that because "the parties are already engaged in ancillary litigation pending in Michigan [state] courts on similar issues[,]" this factor weighs in favor of transfer. Mot. 20. Plaintiff responds that Defendants are trying to "make an end-run" around the federal first-to-file rule, which would automatically transfer Defendants' related claims to this Court if Defendants had filed them in the proposed transferee Michigan federal district court rather than Michigan state court. Resp. 20; *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999). The Parties agree that the "ancillary litigation" was filed by Defendant Great Lakes in Michigan state court over three months after Plaintiff filed the current action. Resp. 20.

Defendants' requested remedy of § 1404(a) transfer does not resolve their stated "practical problem" of litigating in two different courts, which Great Lakes manufactured by separately filing its state court claims months after Plaintiff filed the current action. Rather than requesting dismissal on the basis of *forum non conveniens*, Defendants request a transfer of this case to a different federal district court, which would have no effect on the state court litigation. Indeed, only Great Lakes wields the power to solve this "practical problem" by bringing its state court claims as counterclaims in this Court. Hence, this factor remains neutral.

Upon weighing all relevant factors and giving deference to Plaintiff's choice of venue, the Court concludes that the Defendants have not met their burden to clearly demonstrate that a transfer is warranted for the convenience of parties and witnesses and in the interest of justice. The Signatory Defendants are bound by their forum selection agreements, as are the closely related Non-Signatory Defendants. Further, the judicial economy considerations of having all

claims determined in a single lawsuit far outweigh any of the Non-Signatory Defendants' interests in transferring the case to Michigan. Accordingly, the Court denies the motion to transfer venue.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion to Dismiss for Lack of Personal Jurisdiction or to Transfer Venue [ECF No. 21].

**SO ORDERED.**

SIGNED November 9, 2022.

**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**