# United States District Court

## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| ENERGIUM HOLDING LLC d/b/a<br>ENERGIUM HEALTH<br><br>v.<br><br>ASCENSION MYHEALTH URGENT<br>CARE, FADI DEMASHKIEH, M.D.,<br>MICHEL ALKHALIL, M.D,<br>SHAFIQUL ALAM, M.D., ALI MAHDI<br>GABALI, M.D., Ph.D, CONSORTIUM<br>LABORATORY SERVICES, ENCORE<br>DIAGNOSTICS, LLC, A. GABALI<br>M.D., PLC, DIAGNOSTIC<br>HEMATOLOGY PC, GREAT LAKES<br>EQUIPMENTS LLC, J&K SUPPLIES<br>AND MANAGEMENT, LLC, MY<br>HEALTH URGENT CARE, P.C., and<br>MY HEALTH UC MANAGEMENT PLC | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 3:21-CV-2951-S |

## <u>AMENDED MEMORANDUM OPINION AND ORDER[1]</u>

This Amended Memorandum Opinion and Order addresses Defendants' Partial Motion for Summary Judgment ("Defendants' Motion") [ECF No. 184] and Counter-Defendants Energium Holding LLC d/b/a Energium Health and Feras Meqbel's (collectively, "Counter-Defendants") Motion for Partial Summary Judgment on Defendants' Counterclaims ("Counter-Defendants' Motion") [ECF No. 190]. The Court has reviewed and considered Defendants' Motion, Defendants' Brief in Support of Defendants' Motion ("Defendants' Brief") [ECF No. 185], Plaintiff's Response to Defendants' Motion ("Plaintiff's Response") [ECF No. 202], Plaintiff's Brief in Support of Plaintiff's Response ("Plaintiff's Response Brief") [ECF

---

[1] This Amended Memorandum Opinion and Order corrects a clerical error in the Conclusion of the Court's November 12, 2024, Memorandum Opinion and Order [ECF No. 220], where the Court had in error dismissed Counter-Defendant Feras Meqbel from the case. The parties have proceeded as if the remaining claim against Meqbel survived as evidenced by their Joint Pretrial Order [ECF No. 226] filed on November 20, 2024.

No. 203], Defendants' Reply Brief [ECF No. 209], Counter-Defendants' Motion, Counter-Defendants' Brief in Support of Counter-Defendants' Motion ("Counter-Defendants' Brief") [ECF No. 191], Defendants' Response to Counter-Defendants' Motion ("Defendants' Response") [ECF No. 198], Defendants' Brief in Support of Defendants' Response ("Defendants' Response Brief") [ECF No. 199], Counter-Defendants' Reply in Support of Counter-Defendants' Motion [ECF No. 210], the summary judgment evidence presented, and the applicable law. For the following reasons, Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**, and Counter-Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

This case centers around the fallout of a business relationship during the COVID-19 pandemic between Plaintiff Energium Holding LLC d/b/a Energium Health and certain doctors and business entities named as defendants herein. Plaintiff alleges that Defendants orchestrated a scheme to fraudulently induce Plaintiff to invest in new medical laboratories with no intention to pay Plaintiff back or share in the proceeds from those laboratories' performance of COVID-19 testing services. *See generally* Plaintiff's Third Am. Compl. ("Amended Complaint") [ECF No. 117]. Plaintiff brings claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., unjust enrichment, and breach of contract.[2]

### *A. Defendants*

There are 13 Defendants in this suit. The individual defendants are Ali Mahdi Gabali, M.D., Ph.D, Shafiqul Alam, M.D., Fadi Demashkieh, M.D., and Michel Alkhalil, M.D., each of whom have various ownership interests in the entity defendants. Am. Compl. ¶ 10(a)-(d).

---

[2] In the Amended Complaint, Plaintiff brought a common-law fraud claim, Am. Compl. ¶¶ 359-64, but the Court dismissed it for failure to state a claim, *see* Order [ECF No. 126].

With respect to the entity defendants, A. Gabali M.D., PLC d/b/a Hematology Oncology Global Services ("Hematology Oncology") provides health care and management services and is owned by Gabali. Am. Compl. ¶¶ 10(d), 11(a), 62; App. to Counter-Defs.' Br. ("Counter-Defendants' Appendix") [ECF No. 196] 4 at 61:21-24. Diagnostic Hematology PC d/b/a Diagnostic Hematology and Diagnostic Hematology Oncology ("Diagnostic Hematology") provided clinical laboratory services, and Gabali had an ownership interest in it before it was dissolved. Am. Compl. ¶¶ 10(d), 11(b); App. in Supp. of Defs.' Mot. ("Defendants' Appendix") [ECF No. 187] 26 at 23:9-12.[3] Consortium Laboratory Services ("Consortium") provided clinical laboratory testing services, and Gabali had an ownership interest in it before it was dissolved. Am. Compl. ¶¶ 10(d), 11(c), 54-55; Defs.' App. 26 at 23:9-12. Encore Diagnostics, LLC ("Encore") provides clinical laboratory testing services, and its owners include Alam, Demashkieh, and Alkhalil. Am. Compl. ¶¶ 10(a)-(c), 11(d), 54-55; Defs.' App. 67 at 10:24-11:2. Great Lakes Equipments LLC ("Great Lakes") provides clinical laboratory supplies and equipment, and its owners include Gabali, Alam, Demashkieh, and Alkhalil. Am. Compl. ¶¶ 10(a)-(d), 12(a); Counter-Defs.' App. 4 at 59:8-11. J&K Supplies and Management, LLC ("J&K Supplies") provides clinical laboratory supplies and equipment and is owned by Gabali. Am. Compl. ¶¶ 10(d), 12(b); Defs.' App. 25 at 14:18-19.

My Health Urgent Care, P.C., provides health care and management services. Am. Compl. ¶ 12(c). My Health UC Management PLC (collectively with My Health Urgent Care, P.C., "My Health Entities")[4] provides management services. *Id.* ¶ 12(d). The My Health Entities' owners

_____

[3] Defendants filed a duplicate appendix under seal with exhibits identical to the ones in Defendants' Appendix. *Compare* Defs.' Sealed App. [ECF No. 194] *with* Defs.' App. The Court will cite to the publicly filed version throughout this Order.

[4] The record is unclear on the My Health Entities in general. Defendants move for summary judgment on Plaintiff's unjust enrichment claims against the "My Health Entities," defining those entities as My Health

include Alam, Alkhalil, and Demashkieh. *Id.* ¶ 10(a)-(c); Defs.' App. 44 at 9:13-16, 48 at 29:7-9. Ascension MyHealth Urgent Care is a term used by Plaintiff to describe an "association-in-fact" of Gabali, Alam, Alkhalil, Demashkieh, Great Lakes, J&K Supplies, Hematology Oncology, Diagnostic Hematology, Encore, Consortium, the My Health Entities, and other non-party individuals and entities. Am. Compl. ¶ 9.

### B. Investments in Defendants' Laboratories

Plaintiff is a provider of medical testing supplies and equipment. *Id.* ¶ 8. Beginning in July 2020, Gabali connected with Feras Meqbel, the CEO and owner of Plaintiff, to seek Plaintiff's support in building new clinical laboratories to provide COVID-19 testing services and in furnishing existing clinical laboratories with supplies and equipment. Am. Compl. ¶ 59; Defs.' Br. 5. That month, Gabali and Diagnostic Hematology agreed to purchase from Plaintiff supplies and equipment for Diagnostic Hematology. Am. Compl. ¶ 60; Defs.' Br. 5. Plaintiff provided $232,794.40 in laboratory supplies and equipment to Diagnostic Hematology for which Plaintiff allegedly has not been paid. Pl.'s Resp. Br. 7-8 (citing Pl.'s Resp. App. 146-55). Also as a result of this relationship, Plaintiff gave Hematology Oncology $18,710 in laboratory supplies and equipment for which Plaintiff allegedly has not been paid. *Id.* (citing Pl.'s Resp. App. 129-30).

In November 2020, according to Plaintiff, Gabali introduced Plaintiff to Alam over the phone, and Plaintiff agreed to provide Gabali and Alam support in establishing Encore and Great Lakes. Am. Compl. ¶ 65. Plaintiff provided Encore and Great Lakes $488,245.78 in medical

---

UC Management PLC and My Health Management, LLC. Defs.' Br. 3 n.1. In Plaintiff's Response Brief, Plaintiff defines the "My Health Entities" as My Health Urgent Care, P.C., My Health Management, LLC, and My Health UC Management PLC. Pl.'s Resp. Br. 1 n.1. Demashkieh testified that My Health UC Management PLC and My Health Management, LLC, are the same entity. App. to Pl.'s Resp. Br. ("Plaintiff's Response Appendix") [ECF No. 208] 15-16 at 13:18-14:2. My Health Management, LLC, however, is not named in the Amended Complaint as a Defendant. Accordingly, the Court defines "My Health Entities" to mean My Health Urgent Care, P.C., and My Health UC Management PLC.

testing supplies and equipment for which Plaintiff allegedly has not been paid. Pl.'s Resp. Br. 7-8 (citing Pl.'s Resp. App. 156-61).

In the spring of 2021, according to Plaintiff, it agreed to provide Gabali, Demashkieh, Alkhalil, and Alam support in establishing Consortium. Am. Compl. ¶¶ 103-04. Plaintiff provided Consortium $1,515,151.24 in laboratory supplies and equipment for which Plaintiff allegedly has not been paid. Pl.'s Resp. Br. 7-8 (citing Pl.'s Resp. App. 162).

Sometime during the business relationship between Plaintiff and Gabali, Plaintiff alleges that Gabali, along with Alam, Demashkieh, and Alkhalil, called Meqbel and orally offered to pay Plaintiff one-third of the net proceeds from the laboratory services provided by the new laboratories in return for Plaintiff's investment in the laboratories ("One-Third Agreement"). *See* Am. Compl. ¶¶ 103-04; Defs.' App. 6 at 39:22-41:7, 8 at 47:13-49:25. The record is unclear whether the proceeds were to come solely from laboratory services provided by Consortium, *see* Am. Compl. ¶¶ 103-04, or from all laboratories Plaintiff invested in, Defs.' App. 6 at 39:22-41:7, 8 at 47:13-49:25. Plaintiff alleges that Meqbel asked for a signed written agreement multiple times but that Gabali and the other Defendants never provided one. Am. Compl. ¶¶ 105-06, 123; Defs.' App. 6 at 40:17-41:2. At one point, Meqbel texted Gabali: "We 'EH and You' to buy 5-10% equity in the lab. We will split the share percentage three ways . . . ." Pl.'s Resp. App. 207. It is unclear which laboratory Meqbel was referring to in the text message.

In total, Plaintiff allegedly provided approximately $2,300,000 in medical testing supplies and equipment to Defendants for which Plaintiff allegedly has not been paid. Pl.'s Resp. Br. 7-8; *see also* Defs.' App. 6 at 41:4-7. Plaintiff also contends that Defendants never shared in any net proceeds from these laboratories. Defs.' App. 6 at 40:24-41:7; Pl.'s Resp. App. 80 at 113:3-8.

### C. Advance Commissions

According to Plaintiff, Gabali and Hematology Oncology signed a written agreement with Plaintiff in August 2020 under which Plaintiff would pay Gabali and Hematology Oncology a sales commission for selling Plaintiff's COVID-19 testing supplies. Am. Compl. ¶ 62; Pl.'s Resp. App. 78 at 64:8-15. Between April 2021 and September 2021, Gabali began requesting advances on these sales commissions to be sent to him and J&K Supplies. Am. Compl. ¶ 96; Pl.'s Resp. App. 80 at 110:6-113:15. Plaintiff sent Gabali $10,000 and J&K Supplies $120,860 in advance commissions. Pl.'s Resp. App. 131, 134. Plaintiff contends it is entitled to be paid back these advance commissions. *Id.* at 79-80 at 109:15-113:15.

### D. Consulting Work and Clinical Study

Defendants allege that Plaintiff requested that Gabali provide consulting services for Plaintiff in exchange for payment per consultation encounter. Defs.' Answer to Am. Compl. and Original Countercls. ("Answer") [ECF No. 134] 47 ¶¶ 23-24. Defendants allege that Gabali, through Hematology Oncology and J&K Supplies, provided consulting work to Plaintiff from September 2020 to September 2021.[5] *Id*. at 49 ¶¶ 35-37; Pl.'s Resp. App. 49-52. Defendants also allege that Gabali and Diagnostic Hematology conducted clinical studies for Plaintiff sometime in November 2020 but were not paid for their work. Answer 47 ¶¶ 18-22; Pl.'s Resp. App. 45-48. Beginning in August 2021, Defendants mailed Plaintiff multiple invoices documenting the consultation services and the cost of the clinical study. Pl.'s Resp App. 43-52. Plaintiff, however, alleges that these invoices were fabricated "to offset the substantial debt that Defendants owed to [Plaintiff]." Pl.'s Resp. Br. 8.

---

[5] Defendants' Answer states that it was Diagnostic Hematology (along with J&K Supplies) that provided consulting work to Plaintiff, but the invoices reflect that it was instead Hematology Oncology (along with J&K Supplies) that provided the services. *Compare* Defs.' Answer 49 ¶¶ 35-36 *with* Pl.'s Resp. App. 51-52.

### *E. Delivery of Expired Testing Kits*

Beginning in July 2020, pursuant to a written offer by Plaintiff, Defendants began purchasing testing supplies and equipment from Plaintiff. Answer 46-47 ¶¶ 16-17. Defendants contend that in September 2021, Encore began having inconsistent test results from testing supplies provided by Plaintiff. Defs.' Br. 6. Gabali allegedly discovered that the testing supplies contained expired materials and moldy vials, and he notified Plaintiff of these issues. *Id.* at 6-7; Am. Compl. ¶¶ 149-51. After this incident, Alam notified Plaintiff that Defendants would no longer use Plaintiff as a supplier. Defs.' Br. 7 (citation omitted); Answer 52 ¶ 62.

### *F. Threats to Defendants*

After the business relationship between Plaintiff and Defendants ended, Meqbel allegedly called Gabali and threatened to ruin his career and kill him. Answer 53 ¶ 65; Counter-Defs.' App. 16 at 55:13-23. Meqbel also allegedly contacted colleagues of Gabali and said that he would ruin Gabali's and Alam's reputations and kill them both. Defs.' App. in Supp. of Defs.' Resp. Br. ("Defendants' Response Appendix") [ECF No. 201] 12 at 340:12-21. Further, Meqbel allegedly told Gabali's colleagues that Gabali was a criminal. Answer 53 ¶ 67; Counter-Defs.' App. 16-17 at 57:11-58:5. Alam testified that he suffered "mental stress" as a result of Meqbel's behavior. Defs.' Resp. App. 19 at 58:6-7, 59:17-18.

### *G. Litigation*

After the collapse of their business relationship, Plaintiff sued Defendants. Plaintiff brings RICO claims against all Defendants, unjust enrichment claims against all Defendants, and a breach of contract claim against Gabali, Hematology Oncology, and Diagnostic Hematology. Am. Compl. ¶¶ 207-358, 365-67. Defendants bring counterclaims against Counter-Defendants for breach of

contract, breach of express and implied warranties, negligent performance of contract, unjust enrichment, and intentional infliction of emotional distress. Answer 56-64 ¶¶ 84-145.

## II. LEGAL STANDARD

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a party bears the burden of proof on an issue, he "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). When the nonmovant bears the burden of proof, the movant may demonstrate entitlement to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) showing that there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. *Celotex*, 477 U.S. at 322-25. Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "[C]onclusory statements, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010). Courts resolve factual controversies in favor of the nonmoving party "only when an actual controversy exists, that is, when both parties have submitted evidence

8

of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999)

(citing *McCallum Highlands, Ltd. v. Wash. Cap. Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

### III. ANALYSIS

### A. Defendants' Motion

Defendants move for summary judgment on Plaintiff's RICO claims against all Defendants and Plaintiff's unjust enrichment claims against the My Health Entities, Alkhalil, and Demashkieh. First, the Court examines Defendants' argument that the statute of frauds bars all of Plaintiffs' claims based on the One-Third Agreement. Second, the Court considers Defendants' request for summary judgment on Plaintiff's RICO claims based on Plaintiff's failure to establish a pattern of racketeering activity. Third, the Court analyzes Defendants' argument that the unjust enrichment claims against the My Health Entities, Alkhalil, and Demashkieh fail because the benefit allegedly received by these Defendants is too attenuated.

### i. Statute of Frauds

Defendants contend that the alleged oral One-Third Agreement violates the statute of frauds. Defs.' Br. 18-20. Thus, Defendants argue, Plaintiff cannot rely on this agreement as the basis for its RICO, unjust enrichment, or breach of contract claims. *Id.* at 20. To the extent Defendants move for summary judgment based on the viability of the One-Third Agreement, the Court finds that genuine issues of material fact exist as to whether the One-Third Agreement violates the statute of frauds. Accordingly, the Court denies Defendants' Motion to the extent it seeks summary judgment on any of Plaintiff's claims, including its RICO, unjust enrichment, and breach of contract claims, on this basis.

### ii. RICO

The Court finds that Plaintiff's RICO claims based on wire fraud and mail fraud cannot survive summary judgment. For the wire fraud allegations, there is no evidence of any material

representations made by Defendants over interstate wires or of Defendants' intent to defraud. For the mail fraud allegations, the mailings at issue occurred over a short period of time and were directed toward one victim to further one scheme. Thus, no genuine issues of material fact exist as to a threat of continuing activity, a necessary element of a RICO claim.

Plaintiff brings claims for RICO violations under 18 U.S.C. § 1962(a) and (c). Am. Compl. ¶¶ 207-355. RICO creates a cause of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. §] 1962." *Brown v. Protective Life Ins. Co.*, 353 F.3d 405, 407 (5th Cir. 2003) (first alteration in original) (quoting 18 U.S.C. § 1964(c)). In layman's terms, Section 1962(a) provides that "a person who has received income from a pattern of racketeering cannot invest that income in an enterprise," and Section 1962(c) provides that "a person who is employed by or associated with an enterprise cannot conduct the enterprise's affairs through a pattern of racketeering." *In re Burzynski*, 989 F.2d 733, 741 (5th Cir. 1993). To prevail on a civil RICO claim under either subsection, "there must be: '(1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct, or control of an enterprise.'" *Brown*, 353 F.3d at 407 (quoting *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 439 (5th Cir. 2000)). As it is dispositive in this case, the Court considers only the second element, a pattern of racketeering activity.

A "pattern of racketeering activity" involves "at least two" predicate acts of racketeering activity. 18 U.S.C. § 1961(5). "[R]acketeering activity" covers a broad range of activities, such as threats, theft, and fraud. *See id*. § 1961(1). Here, Plaintiff alleges two predicate acts: (1) wire fraud, under 18 U.S.C. § 1343, and (2) mail fraud, under 18 U.S.C. § 1341.[6] Pl.'s Resp. Br. 6-7; Defs.'

---

[6] In its Third Amended Complaint, Plaintiff also alleges that Defendants engaged in money laundering, pursuant to 18 U.S.C. § 1956. *See* Am. Compl. ¶ 18. But Plaintiff has abandoned that argument by failing to address it in its Response. *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (finding that the plaintiff abandoned a claim when she failed to "pursue [the] claim beyond her complaint"

Br. 12. To establish wire and mail fraud, Plaintiff must show "(1) a scheme to defraud; (2) use of [wire communications or] the mails to execute that scheme; and (3) the specific intent to defraud." *United States v. Swenson*, 25 F.4th 309, 316 (5th Cir. 2022) (citation omitted) (mail fraud); *United States v. Radley*, 632 F.3d 177, 184-85 (5th Cir. 2011) (citations omitted) (wire fraud). While a plaintiff can establish mail fraud with either interstate or intrastate use of the mails, "wire fraud requires interstate use of the wire." *Arruda v. Curves Int'l, Inc.*, 861 F. App'x 831, 834 (5th Cir. 2021) (citation omitted). A "scheme to defraud" includes "any false or fraudulent pretenses or representations intended to deceive others in order to obtain something of value, such as money, from the [entity] to be deceived." *Swenson*, 25 F.4th at 316 (alteration in original) (citations omitted) (mail fraud); *United States v. Hoeffner*, 626 F.3d 857, 863 (citing 18 U.S.C. § 1343) (wire fraud). To establish a scheme to defraud under the wire and mail fraud statutes, Plaintiff must show a "material" falsehood. *Neder v. United States*, 527 U.S. 1, 20-25 (1999).

If a plaintiff can show at least two predicate acts of racketeering activity, then it must establish that those predicate acts constitute a "pattern" of racketeering activity. *Brown*, 353 F.3d at 407 (citation omitted). To do so, "a plaintiff must show both a relationship between the predicate offenses . . . and the threat of continuing activity." *D&T Partners, L.L.C. v. Baymark Partners Mgmt., L.L.C.*, 98 F.4th 198, 205 (5th Cir. 2024) (quoting *Malvino v. Delluniversita*, 840 F.3d 223, 231 (5th Cir. 2016)). As to the relationship element, predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989) (citation omitted). The continuity element requires "a closed

---

or defend it in response to a motion to dismiss (citation omitted)); *see also Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim." (citation omitted)).

period of repeated conduct" or "past conduct that by its nature projects into the future with a threat of repetition." *Id*. at 241 (citation omitted). These principles are called "closed" and "open-ended" continuity. *D&T Partners*, 98 F.4th at 205.

Thus, for Plaintiff's RICO claims to survive, there must be a genuine question of material fact as to whether there is a pattern of wire fraud and/or mail fraud. The Court determines that there is not.

### a. Wire Fraud

The Court finds no evidence of wire fraud because the record is devoid of any material misrepresentations made by Defendants over interstate wire communications or evidence that Defendants never intended to reimburse or share in revenue with Plaintiff. As such, the allegations of wire fraud cannot serve as predicate acts of racketeering activity for purposes of the RICO claims.

Instead, Plaintiff's wire fraud allegations are "breach of contract claim[s] dressed in civil RICO garb." *Zastrow v. Hous. Auto Imports Greenway Ltd.*, 789 F.3d 553, 562 (5th Cir. 2015). "[B]reach of contract is not fraud, and a series of broken promises therefore is not a pattern of fraud." *CADG Erwin Farms, LLC v. Ipour*, No. 3:22-CV-02896-M, 2024 WL 1394501, at *5 (N.D. Tex. Mar. 31, 2024). While Plaintiff presents five separate allegations of wire fraud, most of the allegations are only supported by evidence of broken promises. The Court addresses each allegation in turn.

First, Plaintiff alleges that Defendants used phone calls, text messages, and emails to induce Plaintiff to invest in Defendants' various laboratories without intending to reimburse Plaintiff or share in the revenue from those laboratories.[7] Pl.'s Resp. Br. 7. In support, Plaintiff

---

[7] Other district courts in this circuit have found that communications made over the phone, text message, and email can serve as the basis for liability under the wire fraud statute. *See, e.g.*, *Harvard v. Collins*,

cites (1) a summary of various outstanding invoices it has against Consortium for equipment Plaintiff provided to Consortium and (2) a letter sent by a vendor to Hematology Oncology confirming that Plaintiff paid two separate invoices on behalf of Consortium and Hematology Oncology. *Id.* at 7 n.18 (citing Pl.'s Resp. App. 143, 162). Though these invoices may be evidence of equipment provided to Consortium and capital paid on behalf of Hematology Oncology, they are not evidence of phone calls, text messages, emails, or any other interstate wire communications. Nor are they evidence of an alleged misrepresentation over any interstate wire made by any Defendant. *Radley*, 632 F.3d at 184-85 (noting that a wire fraud claim requires a material misrepresentation made over interstate wires).

In addition to failing to show a scheme to defraud over the wires with respect to the first allegation, Plaintiff provides no evidence of Defendants' specific intent to defraud. The invoices and the letter do not give rise to a factual dispute on whether Defendants intended to "reimburse [Plaintiff] or share revenue with [Plaintiff]." Pl.'s Resp. Br. 7. "It is hornbook law in Texas that 'the mere failure to perform a contract is not evidence of fraud.'" *Antares Reins. Co. v. Nat'l Transp. Assocs., Inc.*, No. 4:23-CV-00928-P, 2024 WL 1195840, at *5 (N.D. Tex. Mar. 20, 2024) (quoting *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)). Plaintiff cites to no evidence of any material misrepresentations. Nor has Plaintiff provided any evidence that Defendants never intended to pay for supplies and equipment or follow through with the One-Third Agreement. In sum, Plaintiff's first allegation cannot serve as a predicate act of wire fraud.

---

No. 3:13-CV-945-N, 2013 WL 12363628, at *3 (N.D. Tex. Aug. 21, 2013) (noting that interstate communications over the phone or email can constitute predicate acts of wire fraud); *Boroja v. Roux*, No. 1-22-CV-01299-RP, 2023 WL 4054689, at *5-6 (W.D. Tex. June 15, 2023) (finding that Plaintiff had adequately alleged that certain emails and text messages were predicate acts of wire fraud), *report and recommendation adopted by* 2023 WL 4356691 (W.D. Tex. July 5, 2023).

Second, Plaintiff alleges that Gabali, through phone calls, text messages, and emails, induced Plaintiff to advance $140,000 in commission payments to Gabali and J&K Supplies. Pl.'s Resp. Br. 7. To support this argument, Plaintiff cites to (1) Meqbel's deposition transcript and (2) invoices for the advance commission wire payments from Plaintiff to Gabali and J&K Supplies. *Id*. at 7 n.19 (citing Pl.'s Resp. App. 78-80, 131-42). In his deposition, Meqbel testified that "Gabali was supposed to return [the advance commissions] because he did not fulfill the promise" and that "Gabali understood that he must return that money." Pl.'s Resp. App. 79-80 at 109:15-113:15. Meqbel's testimony, along with the invoices memorializing the advance commission payments, are evidence that Plaintiff made payments to Gabali and J&K Supplies. They are not, however, evidence of any phone calls, text messages, emails, or other interstate wire communications. Nor are they evidence that Gabali made material misrepresentations over wire to induce those payments. Moreover, Meqbel's testimony and the invoices are not evidence that Gabali never intended to reimburse Plaintiff for those advance commissions. Again, the mere failure to fulfill a promise, without more, is not evidence of fraud. *See Formosa Plastics*, 960 S.W.2d at 48. Plaintiff's second allegation cannot serve as a predicate act of wire fraud.

Third, Plaintiff alleges that, through phone calls, text messages, and emails, Defendants induced Plaintiff to provide approximately $2.3 million in supplies and equipment to their new laboratories. Pl.'s Resp. Br. 7-8. As support, Plaintiff cites only to invoices for supplies and equipment provided to Gabali, Hematology Oncology, Diagnostic Hematology, Alam, Great Lakes, Encore, and Consortium. *Id*. at 8 nn.20-23 (citing Pl.'s Resp. App. 129-30, 146-62). Plaintiff again fails to direct the Court to any phone calls, text messages, emails, or other interstate wire communications or to any material misrepresentation made via wire by a Defendant. Nor do these invoices provide any evidence that Defendants never intended to reimburse Plaintiff or share

in laboratory proceeds with Plaintiff. Plaintiff's third allegation cannot serve as a predicate act of wire fraud.

Fourth, Plaintiff alleges that Alam falsely claimed over email that Plaintiff sent expired products to Encore. *Id*. at 8. Plaintiff does not direct the Court to a copy of this email, and the Court will not scour the record to find it. *See Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." (citation omitted)). Instead, Plaintiff only directs the Court to Gabali's deposition testimony, which Plaintiff argues supports an inference that "Defendants knowingly utilized the allegedly 'expired' products thereby converting them without ever paying [Plaintiff] for them." Pl.'s Resp. Br. 8 n.24 (citing Pl.'s Resp. App. 36-38 at 262:1-269:19). Plaintiff does not demonstrate how this testimony proves that Alam's email was false when made, and, indeed, the Court cannot find anything in the referenced testimony to support Plaintiff's claim. Plaintiff's fourth allegation cannot serve as a predicate act of wire fraud.

Fifth, Plaintiff alleges that less than two months after it filed this lawsuit, Defendants fraudulently transferred the assets that Plaintiff had provided to Consortium to a new entity, Consortium**s** Laboratory Services, LLC ("Consortiums"). *Id.* at 9-11. As evidence of the fraudulent transfer, Plaintiff directs the Court to the following:

- The summary page for Consortiums on Michigan's Corporations Online Filing System webpage. *Id*. at 9 n.27 (citing Pl.'s Resp. App. 101);

- The Asset Purchase Agreement between Consortium and Consortiums. *Id*. at 9 n.28 (citing Pl.'s Resp. App. 164-98);

- Text messages purporting to show that Consortiums is using the same Clinical Laboratory Improvement Amendments ("CLIA") Number as Consortium used. *Id*. at 9 n.29 (citing Pl.'s Resp. App. 204-05);

- A CLIA Certificate of Registration that names Gabali as the laboratory director for Consortium. *Id*. at 9 n.30 (citing Pl.'s Resp. App. 203); and

- An email from Ellkay, a software company, to Gabali at his old Consortium email address, agabali@consortiumlaboratory.com, received on December 28, 2022, a year after all assets allegedly were transferred to Consortiums. *Id*. at 10 n.31 (citing Pl.'s Resp. App. 201).

Plaintiff also alleges that after it filed this lawsuit, Defendants established other laboratories—Michigan Innovative Diagnostics, LLC, KC Pathology Associates PLLC, and KC Pathology Laboratory, LLC—and used equipment, supplies, and capital they obtained from Plaintiff to form these new laboratories and shift business away from the old laboratories. *Id*. at 10. To support these allegations, Plaintiff cites to a private investigator's affidavit as well as those entities' State of Michigan filings, which demonstrate that Alam is the resident agent and Gabali is the laboratory director for the new entities. *Id*. at 10 n.33, 11 nn.36-37 (citing Pl.'s Resp. App. 91-95, 103, 215-19).

None of this conduct can serve as the basis for predicate acts of racketeering activity. The summary page on Michigan's Corporations Online Filing System, the Asset Purchase Agreement, and the CLIA Certificate of Registration are not wire communications. Plaintiff also has not demonstrated or asserted that the emails or text messages cited are interstate wire communications. *See Arruda*, 861 F. App'x at 834 ("[W]ire fraud requires interstate use of the wire." (citation omitted)). Moreover, none of Plaintiff's evidence shows any material misrepresentation made by

a Defendant via wire to induce payment from Plaintiff. This final allegation cannot serve as a predicate act of wire fraud.

Defendants established that the record lacks evidence supporting Plaintiff's RICO claims based on the predicate act of wire fraud, and Plaintiff, in response, failed to present any evidence of wire fraud. Plaintiff cannot rely on its wire fraud allegations to serve as predicate acts for its RICO claims.

### b. Mail Fraud

With no evidence of wire fraud, the Court next considers Plaintiff's mail fraud allegations. The Court finds no genuine factual dispute as to the threat of continuing activity of mail fraud and thus finds that there is no pattern of racketeering activity.

The only allegations of mail fraud are the allegedly fraudulent invoices Defendants sent to Plaintiff. Pl.'s Resp. Br. 8; Defs.' Br. 12-13. The evidence reflects that Diagnostic Hematology, J&K Supplies, and Hematology Oncology mailed Plaintiff multiple invoices for consulting services and a clinical study that Defendants allegedly provided to Plaintiff. Pl.'s Resp. App. 43-74. Defendants mailed the first invoice on August 1, 2021, *id*. at 45, and the last invoice on December 2, 2021, *id*. at 48. In total, ten invoices were mailed over four months. *Id*. at 43-52, 74. Plaintiff argues that these invoices are fabricated and were sent to "offset the substantial debt" owed to Plaintiff. Pl.'s Resp. Br. 8. This evidence, however, is insufficient to establish a pattern of racketeering activity as there is no threat of continuing activity.

To establish a threat of continuing activity, a plaintiff can show either closed or open-ended continuity. *D&T Partners*, 98 F.4th at 205. For closed continuity, a plaintiff must establish "a series of related [predicate] acts extending over a 'substantial period of time.'" *Id*. (citation omitted). Although the Fifth Circuit engages in a "highly fact intensive" analysis to determine

whether closed continuity exists, "several recurrent principles have emerged." *Id.* at 206. Those principles include, first, "more than a year of racketeering acts constitute[s] a 'substantial period of time.'" *Id*. at 206 (citation omitted). Second, courts look to the "number of victims injured" by the predicate acts. *Id*. Courts are "skeptical of RICO allegations when the victims of the alleged racketeering conduct are limited," since "the idea of continuity embraces predicate acts occurring at different points in time or involving different victims." *Id*. (cleaned up). Third, courts consider whether the predicate acts relate to "one or multiple schemes." *Id*. at 207. Typically, "no RICO liability exists when . . . 'multiple acts of fraud . . . were part and parcel of a single, discrete and otherwise lawful transaction.'" *Id*. (quoting *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 123 (5th Cir. 1996)).

Here, the Court finds no evidence of closed continuity. While the Amended Complaint covers a time frame of about a year and a half, Defendants mailed the allegedly fraudulent invoices over a period of only four months. Pl.'s Resp. App. 43-52, 74. Four months is not a substantial period of time for purposes of a RICO claim. *See, e.g.*, *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1140 (5th Cir. 1992) (finding seven months of racketeering activity insufficient); *Malvino*, 840 F.3d at 231-32 (finding five months of racketeering activity insufficient). RICO is intended to encompass long-term criminal conduct occurring over years, not "extending over a few weeks or months." *D&T Partners*, 98 F.4th at 206 (citation omitted).

Moreover, the invoices were all mailed to a single victim—Plaintiff—to allegedly further a single scheme—to defraud Plaintiff of money by offsetting the substantial amounts of debt owed to Plaintiff. Pl.'s Resp. Br. 8. The record is devoid of any evidence of other victims. Plaintiff alleges that Defendants' scheme involved at least one other victim, Dr. Rabei Bdier, and directs the Court to an incomplete email chain between Bdier and Gabali. Pl.'s Resp. Br. 12 (citing Pl.'s

Resp. App. 208). In this email chain, Bdier accuses Gabali of using an entity's "bank account to issue checks without [his] knowledge" and reminds Gabali that "all loans under the [] company name . . . is [sic] under your liability." Pl.'s Resp. App. 208. After that initial email, Bdier and Gabali continue to argue over the liability for certain loans. *Id*. Plaintiff does not explain to the Court the context of this email, how Bdier was a victim of Defendants' scheme, or how the conduct referenced in this email relates to the alleged racketeering activity directed toward Plaintiff. And the Court will not scour the record to make Plaintiff's arguments for it.[8] *See Malacara*, 353 F.3d at 405 (citation omitted). Concluding that the alleged predicate acts of mail fraud occurred over an insubstantial period of time and were directed toward a single victim to further a single scheme, the Court finds no evidence of closed continuity.

Having found no evidence of closed continuity, the Court next considers whether Plaintiff has established open-ended continuity. For open-ended continuity, a plaintiff must establish "a threat of continuing criminal activity [that] extends indefinitely into the future." *Id*. at 208. The predicate acts must be the "regular way of conducting defendant's ongoing legitimate business . . . or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'" *Id*. (citation omitted). A plaintiff may satisfy this requirement by showing that the defendant "repeats its fraud in similar business settings or would employ the underlying fraud against [others] indefinitely." *Id*. at 209 (citation omitted).

The record here, however, contains no such evidence. Plaintiff alleges that Defendants established multiple laboratories "for little, or no, capital outlay" by "fraudulently induc[ing]

---

[8] Plaintiff also directs the Court to 18 pages of emails between Gabali, Meqbel, and other non-party individuals, including an individual named Mohamed Basahi who appears to work for Plaintiff, Pl.'s Resp. Br. 12 (citing Pl.'s Resp. App. 111-28), but does not explain how these emails between Defendants and representatives of Plaintiff indicate that Defendants' alleged racketeering activity affected more victims other than Plaintiff.

[Plaintiff], and others, e.g., Dr. Rabei Bdier, to provide the necessary capital, equipment, and supplies, without paying them back or sharing any revenues." Pl.'s Resp. Br. 13 (citing Pl.'s Resp. App. 208). This brief reference to Bdier and a citation to the same email between Bdier and Gabali does not demonstrate how Bdier was also a victim of Defendants' mail fraud scheme or any other racketeering activity. And Plaintiff points to no other evidence of any other victims of the alleged racketeering activity or evidence that Defendant would use the same alleged scheme against Plaintiff or others indefinitely. Accordingly, Plaintiff has failed to raise a genuine factual dispute that Defendants have repeated the mail fraud scheme in similar business settings or are likely to use the same scheme against others indefinitely. By failing to show that the alleged mail fraud scheme was the regular way of conducting Defendants' business, Plaintiff has not shown open-ended continuity.

With no threat of closed or open-ended continuing mail fraud, no genuine issue of material fact exists as to a pattern of racketeering activity based on mail fraud. Thus, mail fraud also cannot serve as a predicate act for Plaintiff's RICO claims.

\*        \*        \*

Defendants demonstrated that there is no genuine issue of material fact as to the wire fraud and mail fraud allegations that could serve as the basis for Plaintiff's RICO claims. For its wire fraud allegations, Plaintiff in response directed the Court to no evidence, other than alleged broken promises, of material misrepresentations made by Defendants via interstate wire or of Defendants' specific intent to defraud. For its mail fraud allegations, Plaintiff failed to raise a genuine factual dispute as to a threat of continuing activity and thus failed to show a pattern of racketeering activity based on mail fraud. Plaintiff's RICO claims cannot survive. Therefore, Defendants' Motion is granted as to Plaintiff's RICO claims against all Defendants.

*iii. Unjust Enrichment*

The Court next addresses Plaintiff's unjust enrichment claims against the My Health Entities, Alkhalil, and Demashkieh. The Court finds that the unjust enrichment claims against the My Health Entities cannot survive because the alleged benefit given to those entities by Plaintiff is too attenuated. On the other hand, the Court finds that genuine issues of material fact exist as to the unjust enrichment claims against Alkhalil and Demashkieh.

The Court looks to the substantive law of Texas to analyze the unjust enrichment claims. *Hinkley v. Envoy Air, Inc.*, 968 F.3d 544, 552 (5th Cir. 2020) ("[A] federal court must apply the relevant state's substantive law when adjudicating a claim arising under that state's law[.]"). As an initial matter, the Court recognizes that "[c]ourts of appeals in Texas appear split on whether unjust enrichment is an independent cause of action" or rather "a theory of liability that a plaintiff can pursue through several equitable causes of actions." *Elias v. Pilo*, 781 F. App'x 336, 338 n.3 (5th Cir. 2019) (citations omitted). Despite this disagreement, the Fifth Circuit has held that "a party may still recover under the unjust enrichment theory." *Digital Drilling Data Sys., LLC v. Petrolink Servs., Inc.*, 965 F.3d 365, 379 n.11 (5th Cir. 2020). Moreover, Defendants did not raise this argument in their Motion. For these reasons, the Court need not address this issue. And without opining on this issue, the Court refers to Plaintiff's unjust enrichment theory as a claim.

"Texas law . . . recognizes two theories or species of unjust enrichment: one for passive receipt of a benefit that would be unconscionable to retain, and another for wrongfully securing a benefit."[9] *Credos Indus. Supplies & Rentals, L.L.C. v. Targa Pipeline Mid-Continent Westtex,*

---

[9] The Texas Supreme Court has not yet addressed whether an unjust enrichment claim may be supported by just evidence of the "passive receipt of a benefit." *See Mesilla Office Sols., LLC v. HGS Healthcare, LLC*, No. 4:20-CV-386-SDJ, 2022 WL 510825, at *6 (E.D. Tex. Feb. 21, 2022) (quoting *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)). But since *Heldenfels*, "several Texas intermediate appellate courts have acknowledged a theory of recovery based upon passive receipt of a benefit." *Id.* (collecting cases). The Court finds that "[l]ooking to Texas appellate courts as an indicator of

*L.L.C.* (*In re Matter of KP Eng'g, L.P.*), 63 F.4th 452, 457 (5th Cir. 2023) (alteration in original) (quoting *Digital Drilling*, 965 F.3d at 379); *see also King v. Baylor Univ.*, 46 F.4th 344, 367 (5th Cir. 2022) (citing *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2013, no pet.)). To prove that the defendant has wrongfully secured a benefit, a plaintiff must show "that one party 'has obtained a benefit from another by fraud, duress, or the taking of an undue advantage.'" *Digital Drilling*, 965 F.3d at 379 (quoting *Heldenfels Bros.*, 832 S.W.2d at 41). Unjust enrichment, however, "does not operate to rescue a party from the consequences of a bad bargain," and "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under [such] a quasi-contract theory." *King*, 46 F.4th at 367-68 (alteration in original) (first quoting *First Union Nat'l Bank v. Richmont Cap. Partners I, L.P.*, 168 S.W.3d 917, 931 (Tex. App.—Dallas 2005, no pet.); and then quoting *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000)).

The Court will first address the unjust enrichment claim against the My Health Entities and then turn to the claims against Alkhalil and Demashkieh.

### a. My Health Entities

The Court finds that Plaintiff's unjust enrichment claims against the My Health Entities do not survive summary judgment because the alleged benefit received by the My Health Entities from Plaintiff is too attenuated.

Defendants argue that these claims fail because the My Health Entities did not receive any investments or benefits "directly from Plaintiff." Defs.' Br. 18. Plaintiff does not allege that the My Health Entities either passively received or wrongfully secured any capital, equipment, supplies, or other benefit from Plaintiff. Rather, it alleges only that the My Health Entities

---

how the Texas Supreme Court would decide this issue," a plaintiff may recover for unjust enrichment under either theory. *Id.* at *7.

"benefited directly from the profits of the Ascension My Health Urgent Care clinics," which used Encore—a laboratory that received supplies and equipment from Plaintiff—as their laboratory for testing services. Pl.'s Resp. Br. 14-15.

This alleged benefit is too attenuated. According to Plaintiff's theory of unjust enrichment, it first provided testing supplies and equipment to Encore. *Id.* at 14-15; Pl.'s Resp. App. 156-61. Then using those supplies and equipment, Encore processed medical tests for the Ascension My Health Urgent Care clinics. Pl.'s Resp. Br. 15 (citing Pl.'s Resp. App. 22-23 at 17:7-18:9). Those clinics then profited from Encore's medical testing services. *Id.* Since Plaintiff does not explain in its Response Brief how those urgent care clinics profited, the Court assumes that they received reimbursements from patients and/or private or government health insurance plans. And then, after those three steps, Plaintiff alleges that the My Health Entities "directly" benefited from the profits received by the Ascension My Health Urgent Care clinics. *Id.*

Plaintiff fails to draw for the Court a clear line from the profits of the Ascension My Health Urgent Care clinics to the alleged benefit received by the My Health Entities. *See Malacara*, 353 F.3d at 405 (noting that a district court need not "sift through the record" to make a party's argument for it (citation omitted)). Even if such a connection were made, the alleged benefit received by the My Health Entities is far too removed from the initial benefit—the testing supplies and equipment—given to Encore. *See Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 372 & n.8 (5th Cir. 2000) (affirming denial of request for an accounting of defendant's profits to support an unjust enrichment claim since the alleged benefit was too "speculative" and "attenuated"); *Nguyen v. Watts*, 605 S.W.3d 761, 789 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) ("[A] plaintiff seeking restitution from an unjustly enriched defendant must show that she is the source of the alleged improper benefit rather than having only a remote or attenuated connection to it." (citation

23

omitted)); *Fulcrum Credit Partners LLC v. Strategic Cap. Res., Inc.*, No. A-10-CA-137 LY, 2011 WL 13104241, at *5 (W.D. Tex. Mar. 15, 2011) (collecting cases dismissing unjust enrichment claims because the benefit received was too attenuated or indirect (citations omitted)), *report and recommendation adopted by* 2011 WL 13104242 (W.D. Tex. Apr. 1, 2011); *Tex. Carpenters Health Benefit Fund v. Philip Morris, Inc.*, 21 F.Supp.2d 664, 678 (E.D. Tex. Aug. 31, 1998) (dismissing unjust enrichment claim since the alleged benefit was "too indirect, remote and speculative").

The alleged benefit to the My Health Entities is too attenuated to create a genuine issue of material fact as to unjust enrichment. The Court therefore grants Defendants' Motion on Plaintiff's unjust enrichment claim against the My Health Entities.

### b. Alkhalil and Demashkieh

As to Plaintiff's unjust enrichment claims against Alkhalil and Demashkieh, the Court finds that genuine issues of material fact exist such that a reasonable jury might return a verdict in favor of either party. Accordingly, the Court denies Defendants' Motion on Plaintiff's unjust enrichment claims against Alkhalil and Demashkieh

\*    \*    \*

In sum, the Court denies Defendants' Motion to the extent Defendants move for summary judgment on any of Plaintiff's claims on the basis that the alleged One-Third Agreement violates the statute of frauds, grants Defendants' Motion on Plaintiff's RICO claims against all Defendants and on Plaintiff's unjust enrichment claims against the My Health Entities, and denies Defendants' Motion on Plaintiff's unjust enrichment claims against Alkhalil and Demashkieh.

*B. Plaintiff's Motion*

Counter-Defendants move for summary judgment on Encore and Great Lakes' breach of contract, breach of warranties, and negligent performance of contract counterclaims against Plaintiff, as well as Alam's intentional infliction of emotional distress counterclaim against Meqbel. First, the Court considers Counter-Defendants' request for summary judgment on Encore and Great Lakes' breach of contract and breach of warranties claims. Second, the Court examines Counter-Defendants' argument that Encore and Great Lakes' negligent performance of contract counterclaims are barred by the economic loss rule. Third, the Court analyzes Counter-Defendants' argument that Alam's intentional infliction of emotional distress claim fails because Meqbel did not engage in extreme and outrageous conduct and Alam did not suffer severe emotional stress.

*i. Breach of Contract and Breach of Warranties*

As to Encore and Great Lakes' breach of contract and breach of warranties counterclaims against Plaintiff for providing defective COVID-19 testing supplies, the Court finds that genuine issues of material fact exist such that a reasonable jury might return a verdict in favor of either party. Accordingly, the Court denies Counter-Defendants' Motion as to Encore and Great Lakes' breach of contract and breach of warranties counterclaims against Plaintiff.

*ii. Negligent Performance of Contract*

The Court finds that Encore and Great Lakes' negligent performance of contract counterclaim against Plaintiff fails because any harm those Defendants have suffered can be remedied through their breach of contract or breach of warranties counterclaims against Plaintiff.

Negligent performance of contract is a tort claim. "The economic loss rule generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Pal-Con,*

*Ltd. v. Wheeler* (*In re Wheeler*), 612 F. App'x 763, 767 (5th Cir. 2015) (quoting *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014)). As such, to state a tort claim, a party must identify a breached duty that is "independent of the contractual undertaking," and the harm suffered must be "not merely the economic loss of a contractual benefit." *Id.* (quoting *McCaig v. Wells Fargo Bank (Tex.), N.A.*, 788 F.3d 463, 475 (5th Cir. 2015)).

Here, Defendants' injuries and Plaintiff's duty are both contractual in nature. *See Antares Reins. Co.*, 2024 WL 1195840, at *6 (noting that the economic loss rule is designed to prevent plaintiffs from doubly recovering for a contractual breach by repackaging their contract claim in tort verbiage). The only harms that Defendants identify are the cost of re-running patient samples, the use of additional testing kits for each patient, the cost of decontamination of the equipment, and damage to the equipment, each of which are recoverable as incidental and consequential damages under Defendants' breach of contract and breach of warranties counterclaims. Defs.' Resp. Br. 9-10.

Moreover, Defendants have not directed the Court to any independent duty that Plaintiff owed Defendants outside of its contractual duty. Defendants argue that Plaintiff owed two independent duties to Encore and Great Lakes. Both arguments are unavailing. First, Defendants assert that Plaintiff owed an independent duty "to skillfully, carefully, diligently, and competently provide COVID-19 testing supplies to Defendants in the midst of a global health pandemic." Defs.' Resp. Br. 8. Defendants, however, provide no case law to support this assertion. Second, Defendants claim that Plaintiff had a "duty not to harm or damage Defendants' property" that was separate from any contractual duty owed. *Id.* at 9. Defendants' citation to *In re Wheeler* provides no support for this argument. *Id.* at 8-9. In *Wheeler*, the Fifth Circuit held that the economic loss rule did not bar the plaintiff's tort claim against a non-contracting delivery company for damages

26

to goods occurring during delivery. 612 F. App'x at 767. It reasoned that Texas Supreme Court precedent allowed for recovery of tort damages where a defendant physically damaged property owned by plaintiff, with whom the defendant had no contractual relationship. *Id*. This precedent, however, does not apply to create an independent duty for Plaintiff, who had a contract with Encore and Great Lakes. Any duty Plaintiff owes Encore and Great Lakes regarding damage to those Defendants' property arises out of that contract.

Because the economic loss rule precludes Encore and Great Lakes' negligent performance of contract counterclaim, no genuine issues of material fact exist on that counterclaim. Thus, the Court grants Counter-Defendants' Motion on Encore and Great Lakes' negligent performance of contract counterclaim against Plaintiff.

*iii. Intentional Infliction of Emotional Distress*

The Court finds that Alam's counterclaim of intentional infliction of emotional distress against Meqbel fails because Alam has failed to show extreme and outrageous conduct by Meqbel or that Alam suffered severe emotional distress.

A plaintiff bringing an intentional infliction of emotional distress claim "must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004) (citation omitted). A plaintiff has a "high threshold to establish" when bringing a claim for intentional infliction of emotional distress. *Stelly v. Duriso*, 982 F.3d 403, 409 (5th Cir. 2020) (citing *Twyman v. Twyman*, 855 S.W.2d 619, 621-22 (Tex. 1993)). As to the second element, extreme and outrageous conduct is conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized community." *Twyman*, 855 S.W.2d at 621 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt d (1965)). "Liability does not extend to mere insults [or] threats." *Hoffmann-La Roche Inc.*, 144 S.W.3d at 445 (citation omitted). As to the fourth element, a "plaintiff must present evidence that his distress was so severe that 'no reasonable man could be expected to endure it.'" *McKethan v. Tex. Farm Bureau*, 996 F.2d 734, 742 (5th Cir. 1993) (quoting *K.B. v. N.B.*, 811 S.W.2d 634, 640 (Tex. App.—San Antonio 1991, writ denied)).

Alam has failed to provide sufficient evidence of intentional infliction of emotional distress. The Court finds that Meqbel's statements over the phone to Gabali, where he said that he was going to destroy the reputation of Gabali and Alam and also kill them both, are "mere threats." Defs.' Resp. App. 12 at 340:12-21. A single occurrence of a threat, especially one not heard directly by Alam, does not rise to the "high threshold" for extreme and outrageous conduct. *Stelly*, 982 F.3d at 409. Moreover, evidence that Meqbel went to Defendants' various urgent care clinics and laboratories and accused Alam and Gabali of "doing criminal activities" also does not rise to the level of "extreme and outrageous conduct" and is evidence of defamation rather than intentional infliction of emotional distress. Defs.' Resp. App. 18 at 56:14-57:16; *see also Diamond Shamrock Refin. & Mktg. Co. v. Mendez*, 844 S.W.2d 198, 201-02 (Tex. 1992) (dismissing a complaint where the intentional infliction of emotional distress claim was based on a defendant "falsely depicting [plaintiff] in the community as a thief")).

Moreover, Alam has presented no evidence that he suffered severe emotional distress except for two conclusory statements regarding his "mental stress." Defs.' Resp. App. 19 at 58:6-7, 59:17-18. This conclusory evidence is insufficient to survive summary judgment. *Compare Skidmore v. Precision Printing & Pkg., Inc.*, 188 F.3d 606, 614 (5th Cir. 1999) (finding evidence of lost weight, anxiety attacks, headaches, nightmares, depression, and post-traumatic stress

disorder to be sufficient to show severe emotional distress), *with McKethan*, 996 F.2d at 742-43 (upholding a lower court's dismissal of an intentional infliction of emotional distress claim where the plaintiff only had "conclusory testimony regarding his self-diagnosed depression").

Finding that no genuine factual disputes exist as to Alam's intentional infliction of emotional distress counterclaim against Meqbel, the Court grants Counter-Defendants' Motion on that claim.

### IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Partial Motion for Summary Judgment [ECF No. 184]. The Court **GRANTS** Defendants' Motion as to Plaintiff's RICO claims against all Defendants and Plaintiff's unjust enrichment claims against the My Health Entities. These claims are **DISMISSED WITH PREJUDICE**. The Court **DENIES** Defendants' Motion as to Plaintiff's unjust enrichment claims against Alkhalil and Demashkieh and Plaintiff's breach of contract claims against Gabali, Diagnostic Hematology, and Hematology Oncology.

The Court also **GRANTS IN PART** and **DENIES IN PART** Counter-Defendants' Motion for Partial Summary Judgment on Defendants' Counterclaims [ECF No. 190]. The Court **GRANTS** Counter-Defendants' Motion as to Encore and Great Lakes' negligent performance of contract counterclaim against Plaintiff and Alam's intentional infliction of emotional distress counterclaim against Meqbel. These claims are **DISMISSED WITH PREJUDICE**. The Court **DENIES** Counter-Defendants' Motion as to Encore and Great Lakes' breach of contract and breach of warranties counterclaims against Plaintiff.

Because all claims against My Health Urgent Care, P.C., and My Health UC Management PLC are dismissed with prejudice, those parties are **DISMISSED** from the case.

**SO ORDERED.**

SIGNED November 22, 2024.

_____
**BARBARA M.G. LYNN**
**SENIOR UNITED STATES DISTRICT JUDGE**